MANUTCHEHR SOHAEY *et al.*, Plaintiffs-Appellants, v. MARK X. VAN CURA *et al.*, Defendants-Appellees (Kennedy Development Group, Inc., Defendant).

Second District   No. 2—92—0049

Opinion filed December 30, 1992.—Rehearing denied February 16, 1993.

Cary S. Fleischer and James W. Naisbitt, both of Chuhak, Tecson, Kienlen, Feinberg, Grasso & Josephson, of Chicago, for appellants.

Janet S. Angus, of Chicago, for appellee Mark X. Van Cura.

Nancy G. Lischer, D. Kendall Griffith, Maureen R. Lennon, George W. Spellmire, Jr., and Gary J. Bazydlo, all of Hinshaw & Culbertson, of Chicago, for appellees Medical Business Consultants, Inc., Wheeler E. Chapman, and Joan Mleko.

John B. Kincaid, of Mirabella & Kincaid, of Wheaton, for appellees Coldwell Banker Commercial Group, Inc., and Frank Kotnaur.

JUSTICE UNVERZAGT delivered the opinion of the court:

On March 17, 1987, plaintiffs, Dr. Manutchehr Sohaey, Minoo Sohaey, and Dr. Mehdi Behinfar, brought an action in Du Page County circuit court to recover for economic damages incurred as a result of their purchase of a shopping center. Plaintiffs' complaint, as amended and supplemented, contained 11 counts.

Counts I, II and VIII, against defendant Mark X. Van Cura, claimed negligence, breach of fiduciary duty and violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*). Counts III, V, VII and VIII, against defendant Coldwell Banker, claimed negligence, breach of contract, intentional tort, and violation of the Consumer Fraud Act. Counts IV, VI and VIII against defendant Frank Kotnaur, claimed negligence, intentional tort, and violation of the Consumer

Fraud Act. Count IX, against Kennedy Development Group, Inc. (KDG), claimed violation of the Consumer Fraud Act. Counts X and XI, against defendants Medical Business Consultants, Inc., its president, Wheeler E. Chapman, and employee, Joan Mleko (MBC defendants), claimed negligent misrepresentation and breach of contract. Coldwell Banker filed a three-count counterclaim (count III was later withdrawn) for commission fees from plaintiffs. Counts I and II of the counterclaim sounded in *quantum meruit* and breach of contract.

KDG settled with plaintiffs prior to trial. Also before the trial, the trial court entered summary judgment in favor of the MBC defendants on the two counts against them. The jury returned verdicts in favor of Van Cura on counts I and II against him. The jury returned verdicts in favor of Kotnaur and Coldwell Banker on counts III and IV. The trial court directed verdicts in favor of Kotnaur on count VI and Coldwell Banker on counts V and VII and in favor of Coldwell Banker on counts I and II of its counterclaim. The trial court also entered judgment in favor of Coldwell Banker and Kotnaur on count VIII.[1]

Stated in summary form, plaintiffs' appeal raises the following issues:

> (1) whether the jury verdicts in favor of Van Cura on counts I and II were against the manifest weight of the evidence;
>
> (2) whether the trial court erred in granting summary judgments for the MBC defendants;
>
> (3) whether the trial court erred in barring the testimony of two of plaintiffs' expert witnesses;
>
> (4) whether the jury verdicts in favor of Kotnaur on count III and Coldwell Banker on count IV were against the manifest weight of the evidence;
>
> (5) whether the trial court erred in directing verdicts in favor of Kotnaur on count VI and in favor of Coldwell Banker on count VII and the two counts of its counterclaim;
>
> (6) whether the trial court erred in entering judgment in favor of Kotnaur and Coldwell Banker on count VIII;
>
> (7) whether the jury was properly instructed;
>
> (8) whether the trial court erred in certain of its pretrial discovery orders;

---

[1]The allegations of count VIII of the second amended complaint include Van Cura; however, the judgment is in favor of Kotnaur and Coldwell Banker, and there is no disposition of this count as to Van Cura. Plaintiffs appeal count VIII only as to Kotnaur and Coldwell Banker.

(9) whether the trial court erred in certain of its pretrial conference rulings; and

(10) whether the trial court erred in certain of its rulings during the trial.

Plaintiffs allege economic damages arising from their purchase of the Market Square Shopping Center (Market Square) located in Schaumburg, Illinois. The Market Square sale closed on August 5, 1986. Plaintiffs paid $4,350,000 for Market Square.

Plaintiffs suffered economic losses from their purchase of Market Square. These losses were generally in the form of lower than expected rental income, which was not sufficient to cover mortgage payments and other necessary expenses of ownership of Market Square. Plaintiffs had expected the rental income flow from Market Square to cover the expenses of ownership. Plaintiffs presented several expert witnesses who opined that plaintiffs paid substantially more for Market Square than it was worth because many of the tenants were behind on their rents due to undisclosed financial difficulties or stores believed to be open had closed or had not yet opened.

Plaintiffs claimed that several of their agents acted alone and in concert to cause them to suffer these economic losses. They allege that Mark X. Van Cura was their attorney for the Market Square transaction and that Van Cura negligently breached his fiduciary duties to them by concealing information from them and encouraging them to go ahead with the purchase when it was not in their best interest. Plaintiffs testified that if Van Cura had made them aware of this information and had properly advised them, they would not have gone ahead with the purchase of Market Square. Plaintiffs contend that Van Cura did not act in their best interest because of a conflict of interest. Plaintiffs testified they did not know until after the closing that Van Cura was acting as a real estate broker for the transaction and would receive a buyer's side commission from the transaction. Van Cura countered that he was not plaintiffs' attorney in the Market Square deal, that he did not negligently breach his fiduciary duties to plaintiffs, and that plaintiffs knew he was acting as a real estate broker and would get a commission from the transaction. The jury returned verdicts in favor of Van Cura on the negligence and breach of fiduciary duties counts directed against him.

Plaintiffs next claimed that they suffered damages due to the conduct of the MBC defendants. Plaintiffs testified they relied on information provided by the MBC defendants which caused them to go ahead with the Market Square purchase when they otherwise would not have. They claim that the MBC defendants, whom plaintiffs had

contracted with for advice on the financial soundness of the proposed purchase of Market Square, made negligent misrepresentations and breached the contract thus causing damages. The trial court granted the MBC defendants' motions for summary judgment on the two counts against them.

Plaintiffs also claim that they were damaged by the conduct of Kotnaur and his employer, Coldwell Banker. Plaintiffs testified that they believed Kotnaur was acting as their real estate broker in the Market Square sale. Plaintiffs claimed Kotnaur and Coldwell Banker negligently failed to conform to the standard of care required of real estate brokers and therefore breached their fiduciary duties to plaintiffs. Plaintiffs also charged Coldwell Banker with breach of contract, and Kotnaur and Coldwell Banker with intentional tort sounding in civil conspiracy, and violation of the Consumer Fraud Act. Plaintiffs claim damages from all of the charged conduct. Kotnaur denied that he was a real estate broker for the plaintiffs. The trial court directed verdicts in favor of Kotnaur and Coldwell Banker on the counts charging intentional tort and in favor of Coldwell Banker on its counterclaims and entered judgment in favor of Kotnaur and Coldwell Banker on the violation of the Consumer Fraud Act counts. The jury returned verdicts in favor of Kotnaur and Coldwell Banker on the negligence counts.

We initially consider plaintiffs' numerous allegations of error by the trial court with respect to jury instructions and evidentiary rulings during discovery, pretrial conferences, and the trial. The vast majority of plaintiffs' arguments in support of these allegations do not contain citations to the relevant pages of the record or to relevant authorities.

Supreme Court Rule 341(e)(7) provides in pertinent part:

"The appellant's brief shall contain the following parts ***

* * *

(7) Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are waived ***." (134 Ill. 2d R. 341(e)(7).)

Arguments which are not supported by authority do not satisfy Rule 341(e)(7). (*Rockford Memorial Hospital v. Schueler* (1988), 167 Ill. App. 3d 358, 362.) Strict adherence to the rule's requirement of citation to the relevant record pages is necessary to expedite and facilitate the administration of justice. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 48.) Arguments which do not satisfy Rule 341(e)(7) do not merit consideration on appeal (*In re Marriage of*

*Winton* (1991), 216 Ill. App. 3d 1084, 1090) and may be rejected for that reason alone. *Amp-Rite Electric Co. v. Wheaton Sanitary District* (1991), 220 Ill. App. 3d 130, 166.

The trial of this cause was spread over three weeks, producing thousands of pages of transcript. Plaintiffs made 18 distinct allegations of evidentiary error and only cited one authority to support their arguments on four of the allegations. Virtually every allegation of evidentiary error is made without reference to relevant pages in the record. Of the 12 allegations of jury instruction error, only four are supported by citations of relevant authority.

We will not consider the allegations of trial court error not supported by citations to authorities and relevant pages in the record. Those allegations of evidentiary and jury instruction error which are supported by proper citations will be considered in conjunction with the particular issue or issues to which they are relevant.

We will next consider plaintiffs' assertion that the jury verdicts in favor of Van Cura were against the manifest weight of the evidence. The jury returned these verdicts on counts I and II of plaintiffs' complaint. These counts claimed that Van Cura's negligence and breach of fiduciary duties caused plaintiffs to purchase Market Square and thereby suffer economic losses.

Plaintiffs contend that the trial evidence overwhelmingly substantiated their claims on counts I and II. At trial, plaintiffs presented the testimony of various witnesses including their own testimony and introduced numerous documents on this issue into evidence. This evidence tended to show that Van Cura was plaintiffs' attorney for the Market Square purchase; that he did not perform to the standard of conduct expected by an attorney; that he breached his duties as an attorney through a conflict of interest as an undisclosed commissioned real estate broker in the Market Square transaction; and that he prevented plaintiffs from learning the true condition of Market Square in order to insure that the transaction would close so he could get his broker's commission. The only expert witness to testify on these issues concluded from his review of the deposition transcripts and pleadings that Van Cura functioned as the plaintiffs' attorney, acted negligently, and breached his fiduciary duties to the plaintiffs.

At trial, Van Cura testified and denied that he was plaintiffs' attorney for the Market Square transaction. He testified that he told plaintiffs he was a real estate broker and that Dr. Sohaey suggested including Van Cura as a referring broker because they were very close social friends and Dr. Sohaey wanted Van Cura to receive commissions from the deal. Van Cura testified that plaintiffs' awareness that

he was a real estate broker is shown by the fact that the contract for plaintiffs' earlier attempt to buy another shopping center which fell through clearly showed Van Cura as a broker who stood to receive a commission. Van Cura testified he was not listed as a real estate broker on the Market Square sales contract because Coldwell Banker preferred to not show him on the contract.

Van Cura was employed as an associate attorney by Winston and Strawn during the Market Square transaction. Van Cura testified he merely dropped plaintiffs' file off at Winston and Strawn for legal services after the attorney plaintiffs regularly used to represent them in real estate transactions withdrew from the Market Square deal. Van Cura denied that he handled plaintiffs' case for Winston and Strawn. Van Cura identified two attorneys at Winston and Strawn who handled the Market Square transaction for plaintiffs. One of these attorneys, Helen Shapiro, testified that Van Cura was plaintiffs' attorney for the Market Square transaction. Van Cura did not attend the Market Square closing and did not sign the closing book. Van Cura testified that he did not attend the closing because his wife was unexpectedly hospitalized at the time. Winston and Strawn billed the plaintiffs for work done on the Market Square transaction by Shapiro, but did not bill plaintiffs for any work done by Van Cura.

Van Cura argues that much of the confusion surrounding his status with respect to the Market Square transaction stemmed from the fact that he was Dr. Sohaey's trusted friend. Van Cura testified he often performed tasks such as delivering papers or sending correspondence for the plaintiffs, not as their attorney, but as their friend. He testified the confusion was compounded by plaintiffs' desire to shield themselves from identification as the owners of Market Square in order to prevent lawsuits against them. Van Cura testified that as plaintiffs' referring real estate broker and not as their attorney, he received information and correspondence for the plaintiffs in order to shield them.

Van Cura denied that he ever withheld information from plaintiffs so that the Market Square deal would go through. The most critical single piece of information which Van Cura allegedly withheld was that the largest single tenant in Market Square, the Olde World Cheese Shop (Cheese Shop), had closed. Shapiro received this information from the sellers' attorney on August 4, 1986, the day before the deal was scheduled to close. Van Cura testified that Shapiro called him at 7:30 p.m. at home on that day and conveyed this information to him. Van Cura testified that Shapiro asked him to call plaintiffs and advise them of this. Plaintiffs testified that they received the informa-

tion about the closing of the Cheese Shop from Shapiro and that they then called Van Cura about the information and told him that if it was true, the Market Square closing should not go through. Plaintiffs testified that Van Cura said Shapiro did not know what she was talking about and that the Cheese Shop had not closed. Plaintiffs claim they allowed the closing to proceed because of Van Cura's statements. Van Cura testified that he is unsure who called whom, but he did speak to the plaintiffs about the closing of the Cheese Shop on August 4, 1986, and their only concern was that the store not be vandalized. Van Cura testified that Kotnaur went to check and found that the store was secure and after the plaintiffs were advised of this plaintiffs proceeded with the Market Square closing fully aware that the Cheese Shop had gone out of business.

A jury verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the findings of the jury are unreasonable, arbitrary, and not based on the evidence. (*First Midwest Bank v. Denson* (1990), 205 Ill. App. 3d 124, 128.) A jury verdict will only be reversed when the evidence, viewed most favorably to the prevailing party, nevertheless so overwhelmingly favors the appellant that no contrary verdict could ever stand. (*York v. Stiefel* (1983), 99 Ill. 2d 312, 321.) In a jury trial, it is the function of the jury, not an appellate court, to determine both the disputed and undisputed facts of the case and to draw from those facts the reasonable inferences they support. (*Perry v. Storzbach* (1990), 206 Ill. App. 3d 1065, 1070.) An appellate court may not set aside a jury verdict merely because the jury could have drawn different inferences and conclusions. *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Jepsen* (1988), 172 Ill. App. 3d 662, 666.

■ Here, although plaintiffs presented a strong case, Van Cura disputed virtually every contention plaintiffs made. We find that the jury verdict was supported by reasonable inferences and conclusions drawn from the evidence. We will not act as a second jury and attempt to determine the nuances of the evidence or the credibility of the witnesses. Accordingly, we will not disturb the jury verdicts in favor of Van Cura on counts I and II.

■ Our conclusion that the jury verdict should stand is not changed by plaintiffs' allegations of evidentiary errors. The one pretrial conference ruling where plaintiffs allege error involving Van Cura and where plaintiffs did cite some authority concerned the application of the *Moorman* doctrine (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69). Plaintiffs argued that *dictum* in *2314 Lincoln Park West Condominium Association v. Mann, Gin,*

*Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, required the trial court to interpret *Moorman* to allow tort-based actions seeking recovery of economic losses. The trial court, on its own motion, ruled that plaintiffs were limited in their proofs to the two exceptions set forth in *Moorman*. On the basis of a recent supreme court ruling (*Collins v. Reynard* (1992), 154 Ill. 2d 48), we find that the trial court did err in its ruling.

However, the error was harmless. Despite the erroneous ruling, plaintiffs' amended complaint, essentially quite similar to the negligence-based complaint in *Collins*, was allowed to stand. In addition, plaintiffs presented the testimony of an expert, Edward Walsh, who opined that Van Cura was negligent in his representation of plaintiffs. Finally, the relevant jury instructions were framed in terms of professional negligence. Because the error did not prejudice the plaintiffs and did not affect the outcome of the trial, the error does not warrant a reversal. *Leary v. Eng* (1991), 214 Ill. App. 3d 279, 284.

For all of the above reasons, we hold that the jury verdicts in favor of Van Cura on counts I and II were not against the manifest weight of the evidence.

We will next consider the issue of whether the trial court erred in granting summary judgments in favor of the MBC defendants. Late in April or early in May 1986 plaintiff Behinfar contacted defendant Wheeler Chapman, president of Medical Business Consultants (MBC). Behinfar told Chapman he was considering buying Market Square with a partner, Dr. Sohaey. Behinfar sought to retain MBC to analyze and evaluate the merits of the investment before making a commitment to the seller.

Chapman advised Behinfar to make the agreement to purchase Market Square contingent upon the approval of attorneys and accountants. Chapman further advised Behinfar that a contingency agreement would motivate the seller to release data, records and information necessary for evaluation of the investment.

Chapman offered to make a complete financial evaluation of the proposed investment. Plaintiffs accepted the offer and terms proposed by MBC. Plaintiffs subsequently made their agreement to purchase Market Square a contingent agreement with the terms as outlined by Chapman.

Behinfar later delivered to Chapman informational materials relating to Market Square that plaintiffs had received from Kotnaur. Behinfar told Chapman that Kotnaur and Van Cura would furnish or arrange for delivery of additional information that MBC would need to perform the complete financial evaluation of Market Square. Both

Kotnaur and Van Cura promised plaintiffs they would fully cooperate with MBC in its efforts to evaluate the proposed investment. However, the sellers refused to supply additional information and MBC received no further information with regard to the Market Square sale. Consequently, MBC was not able to perform a complete evaluation of the proposed transaction.

Plaintiffs alleged that the MBC defendants did not properly perform the evaluation and made negligent misrepresentations. Plaintiffs claimed they suffered economic losses because of the MBC defendants' alleged breach of contract and negligent misrepresentations.

In their negligent misrepresentation claim, plaintiffs allege that they relied upon the "information, recommendations and negligent misrepresentations of [the MBC defendants] in purchasing Market Square." In the breach of contract claim, plaintiffs alleged they would not have made the purchase if they had received the information MBC was required to furnish by its contract with the plaintiffs. After several hearings on the MBC defendants' motions for summary judgment, the trial court granted summary judgment in favor of the MBC defendants on both counts.

On appeal, plaintiffs contend the trial court erred in granting summary judgment on the negligent misrepresentation claim because there is a question of fact whether they did or did not rely on all the alleged negligent misrepresentations. Plaintiffs concede that Behinfar signed an affidavit dated September 28, 1988, which appears to show plaintiffs did not rely on the representations of the MBC defendants. However, plaintiffs argue that the affidavit only referred to "underlying information related to the economic condition of Market Square," and was not meant to include "all other aspects of the reliance."

The MBC defendants contend that Behinfar's September 28, 1988, affidavit clearly shows that plaintiffs did not rely on the representations of the MBC defendants. The MBC defendants argue that subsequent affidavits by Behinfar and Dr. Sohaey in opposition to the defendants' motion for summary judgment are unconvincing and self-serving. The MBC defendants also argue that the trial court correctly found that the original affidavit was a judicial admission and is sufficient to disprove the essential element of reliance and allow summary judgment with respect to the negligent misrepresentation claim.

Behinfar's September 28, 1988, affidavit contains in pertinent part the following statements:

"7. In or about the month of July 1986, we were advised by MS. JOAN MLENKO [sic] of MEDICAL BUSINESS CON-

SULTANTS that FRANK KOTNAUR declined to produce, or stated that he was unable to obtain, access to documents which could support the financial information submitted to us. VAN CURA informed us that such supporting material could not be obtained within the available time and that it was unnecessary because, based on information obtained by him 'going through' the real estate section of WINSTON & STRAWN 'this was a very good deal indeed,' he stated that 'it is a steal' and he repeatedly assured us that the transactional details were handled by the most competent real estate attorneys at WINSTON & STRAWN.

8. DR. and MRS. SOHAEY and I concluded that MEDICAL BUSINESS CONSULTANTS were unable to perform the task for which they were retained and no attention was given to the various notes and information collected by MEDICAL BUSINESS CONSULTANTS, nor was any fee paid.

9. Neither my partner nor I had copies of the notes, etc., made by MEDICAL BUSINESS CONSULTANTS; the notes were retained by VAN CURA.

10. My partner and I agreed to consumate [sic] the transaction for the purchase of Market Square Shopping Center based solely on the assurances of FRANK KOTNAUR and MARK X. VAN CURA."

Section 2—1005(c) of the Code of Civil Procedure, which describes the requirements for a grant of summary judgment, provides, in relevant part:

"The judgment sought shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).)

Thus, disposal of an issue in a case by summary judgment is proper when the issue may be determined according to a question of law. *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 421.

While the goal of expeditious disposition of a lawsuit by the use of a summary judgment is encouraged, it is a drastic means to disposing litigation and should only be allowed when the right of the moving party is clear and free from doubt. (*Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 271.) Accordingly, a court ruling on a motion for summary judgment must strictly construe the evidence against the movant and liberally in favor of the nonmoving

party. *Logan v. Old Enterprise Farms, Ltd.* (1990), 139 Ill. 2d 229, 234.

Nonetheless, in order to survive a motion for summary judgment, the nonmoving party must come forward with evidence establishing a genuine issue of fact. (*Hotze v. Daleiden* (1992), 229 Ill. App. 3d 301, 305.) Summary judgment in favor of a defendant is proper where a plaintiff has not established an essential element of a cause of action. (*Gresham v. Kirby* (1992), 229 Ill. App. 3d 952, 954-55.) One of the essential elements of a negligent misrepresentation claim is action by the plaintiff in reliance on the truth of the statements. *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 452.

Thus, to survive defendants' motion for summary judgment with respect to their claim of negligent misrepresentation in this case, plaintiffs must establish all the elements of the claim including reliance on defendants' alleged negligent misrepresentations in agreeing to purchase Market Square. However, Behinfar's affidavit of September 28, 1988, shows on its face that the plaintiffs did not rely on the representations made by the MBC defendants in reaching their decision to purchase Market Square. The affidavit states that the plaintiffs paid "no attention" to the "notes and information collected by MEDICAL BUSINESS CONSULTANTS." The affidavit further states that the plaintiffs made their decision "solely on the assurances of" Kotnaur and Van Cura.

In an attempt to overcome the seemingly damning statements of Behinfar's September 28, 1988, affidavit, the doctors filed subsequent affidavits virtually identical to each other by which they tried to show Behinfar's earlier affidavit was not intended to include all of the aspects of reliance upon MBC's representations. The later affidavits purported to show that the plaintiffs did rely on "the assurances" of Chapman and took what Chapman said into account in making their decision.

The trial court found no merit in plaintiffs' later affidavits on this matter. It ruled that the earlier affidavit was a judicial admission and could not be recanted by subsequent affidavits. On appeal, plaintiffs contend the court should have considered all the facts in plaintiffs' "actual knowledge" and not have only considered the earlier affidavit in determining whether summary judgment was proper.

A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge. (*Van's Material Co. v. Department of Revenue* (1989), 131 Ill. 2d 196, 212.) Judicial admissions may be made during discovery depositions. (*Van's Material Co.*, 131 Ill. 2d at 212-13.) A judicial admission

is conclusive upon the party who made it, and the party may not controvert the admission at trial or on appeal, so the effect of a judicial admission is to withdraw a fact from contention. (*Brummet v. Farel* (1991), 217 Ill. App. 3d 264, 267.) A party cannot create a question of fact for purposes of a summary judgment motion by attempting to contradict a previous judicial admission. *Stofer v. First National Bank* (1991), 212 Ill. App. 3d 530, 539.

■ We find that the trial court correctly concluded that Behinfar's September 28, 1988, affidavit was a judicial admission. The affidavit was a deliberate, clear, unequivocal statement about the fact of what the plaintiffs relied upon in arriving at their decision to purchase the shopping center. This fact was within the peculiar knowledge of the plaintiffs. Because the September 28, 1988, affidavit is a judicial admission, plaintiffs may not controvert it. Plaintiffs' judicial admission shows they relied solely on the assurances of Kotnaur and Van Cura in reaching their decision to purchase Market Square. Therefore, by their own admission, plaintiffs did not rely on the representations of the MBC defendants. Because they did not rely on the representations of the MBC defendants, there can be no negligent misrepresentation. The summary judgment in favor of the MBC defendants with respect to the negligent representation claim was proper.

The trial court also granted the MBC defendants' motion for summary judgment against plaintiffs' claim of breach of contract. Plaintiffs appeal on the ground that a material question of fact existed as to whether their conduct was sufficiently clear, unambiguous and unequivocal for the court to conclude as a matter of law that they had rescinded, abandoned, or waived the contract. Defendants contend that plaintiffs' conduct amounted to an implicit rescission of the contract sufficient to warrant summary judgment because the conduct amounted to abandonment, waiver, and acquiescence in nonperformance of the contract.

It is well established:

> "The agreement to cancel or rescind a contract may be either express or implied. An implied agreement to rescind may be shown by the acts of the parties in the surrounding circumstances or course of conduct. If either party without right claims to rescind a contract, failure of the other to object to, and his acquiescence in, the rescission makes it effective as a rescission by mutual assent. In other words, where the acts of one party which are inconsistent with the existence of the contract are acquiesced in by the other party, the contract will be

deemed to have been abandoned by both." 12A Ill. L. & Prac. *Contracts* §373, at 209 (1983).

Rescission and abandonment are closely related and may sometimes be used interchangeably. (*Mor-Wood Contractors, Inc. v. Ottinger* (1990), 205 Ill. App. 3d 132, 142.) Both rescission and abandonment may be implied from the circumstances or conduct of the parties. (*Mor-Wood*, 205 Ill. App. 3d at 143.) However, the circumstances or conduct relied on must be positive, unequivocal and inconsistent with the existence of a contract to warrant a finding of abandonment. *Bales v. Nelson* (1986), 148 Ill. App. 3d 7, 10.

Whether the conduct of the parties or surrounding circumstances constitute abandonment of a contract is a question of fact. (*Bales*, 148 Ill. App. 3d at 10.) However, where the conduct or circumstances are decisive and unambiguous, a trial court may be justified in deciding the matter as a question of law. *Bales*, 148 Ill. App. 3d at 10.

Waiver is the express or implied voluntary and intentional relinquishment of a known right such as a contractual right. (*Hamilton v. Williams* (1991), 214 Ill. App. 3d 230, 241-42.) An implied waiver may arise from conduct inconsistent with an intention to enforce a right. (*Wells v. Minor* (1991), 219 Ill. App. 3d 32, 45.) The determination of whether conduct is sufficient to constitute the waiver of a contractual right is generally a question of law (*Geier v. Hamer Enterprises, Inc.* (1992), 226 Ill. App. 3d 372, 390) where the material facts are undisputed and only one reasonable inference can be drawn from these facts. (*Wald v. Chicago Shippers Association* (1988), 175 Ill. App. 3d 607, 621.) However, if the material facts are in dispute or reasonable minds could draw more than one inference from undisputed facts, then the matter becomes a question of fact. *Wald*, 175 Ill. App. 3d at 621.

■ Here, despite plaintiffs' unsupported protestations to the contrary, plaintiffs' conduct amounted to an abandonment and waiver of the contract. The purpose of the contract was for the MBC defendants to provide a complete evaluation of plaintiffs' proposed purchase of Market Square. When the plaintiffs bought the shopping center without the complete MBC evaluation, there was no longer any purpose for the contract. This conduct therefore constituted an abandonment or waiver of the contract. Accordingly, we hold that summary judgment granted in favor of the MBC defendants on the breach of contract count is affirmed.

The next issue on appeal by the plaintiffs is whether the trial court erred when it barred the testimony of plaintiffs' proffered expert witness, Richard Guerard. Guerard was to testify regarding the

standard of care for real estate brokers and whether defendants Kotnaur and Coldwell Banker had breached that standard of care.

In reaching its decision to bar Guerard's testimony, the trial court determined that the existence of a duty was a question of law. The court noted that Guerard's answers to discovery interrogatories were based on his interpretations of case law and statutes. The court found that Guerard's testimony regarding the standard of care could convey an incorrect statement of the law to the jury with respect to the duty element of the negligence claim. The court barred Guerard's testimony after concluding that the possibility of creating confusion for the jury in terms of the proper standard of care outweighed any assistance in understanding the evidence Guerard's testimony might give to the jury.

The permissive use of expert testimony is favored in any case where the testimony would assist the jury in its understanding of the facts. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208.) It is proper for a qualified expert to testify regarding a standard of care which is beyond the knowledge of the average person. *Nolan v. Elliott* (1989), 179 Ill. App. 3d 1077, 1086.

However, an expert witness is not competent to give testimony which amounts to statutory interpretation. (*Christou v. Arlington Park-Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, 261.) Nor may an expert witness testify with respect to legal conclusions which a jury could make without the testimony. (*Coyne v. Robert H. Anderson & Associates, Inc.* (1991), 215 Ill. App. 3d 104, 112.) It may be prejudicial error to allow an expert witness to testify regarding what legal research shows with respect to a key legal term in a case if the jury might look to the expert witness for legal guidance on the matter rather than the court. (*Harbor Insurance Co. v. Continental Bank Corp.* (7th Cir. 1990), 922 F.2d 357, 366 (applying Illinois law).) The trial judge is given broad discretion on evidentiary questions such as the admission of expert testimony. *Ferentchak v. Village of Frankfort* (1984), 121 Ill. App. 3d 599, 609, *rev'd on other grounds* (1985), 105 Ill. 2d 474.

■ We find that the trial court did not abuse its discretion in this case. We cannot say the court erred in barring Guerard's testimony after determining the testimony was premised on case law and statutes. The trial court carefully considered the question and concluded that the testimony might confuse the jury and make the jury look to the expert witness for legal guidance on the question of duty. This conclusion was well within the proper discretion of the court. Accord-

ingly, we hold that the trial court did not err in barring Guerard's testimony.

Plaintiffs next claim that the trial court erred when it barred the testimony of its proffered expert witness, Harold J. Carlson. Plaintiffs offered Carlson as a replacement for Guerard. Like Guerard, Carlson would have testified with respect to the standard of care for real estate brokers.

The trial court barred Guerard's testimony on May 2, 1991. On July 3, 1991, two months before the scheduled trial date of September 3, 1991, plaintiffs disclosed Carlson. On August 7, 1991, the trial court granted defendants' motion to bar Carlson. The trial court based its ruling on Supreme Court Rule 220 (134 Ill. 2d R. 220).

The trial court read the *Phelps* decision (*Phelps v. O'Malley* (1987), 159 Ill. App. 3d 214) to require that it impose a sanction of disqualification whenever a party violates Rule 220. Plaintiffs contend Rule 220 should not disqualify Carlson. They assert they acted diligently to replace Guerard and defendants would have had ample time to ascertain Carlson's opinions. They maintain the defendants acted contrary to the spirit of Rule 220 by waiting unnecessarily to make their motion to disqualify Guerard. They argue *Phelps* only requires disqualification under Rule 220 if doing so would not create a manifest injustice. They maintain that barring Carlson was a manifest injustice. They note that defendants capitalized on plaintiffs' lack of expert testimony to establish the standard of care for real estate brokers.

Defendants contend Rule 220 bars Carlson's testimony. Defendants argue that Rule 220 disqualifies any expert witness not disclosed prior to a court ordered cutoff date. They note that the trial court in this case established a cutoff date of January 14, 1991, for disclosure of experts. They maintain plaintiffs failed to meet this cutoff date and did not offer an explanation for the delay, contest the cutoff date, or address factors courts use in determining whether an undisclosed witness should be excluded. They argue the trial court properly disqualified Carlson under Rule 220.

Rule 220 states in relevant part:

"(b) Disclosure.

(1) Expert witness. Where the testimony of experts is reasonably contemplated, the parties will act in good faith to seasonably:

(i) ascertain the identity of such witnesses, and

(ii) obtain from them the opinions upon which they may be requested to testify.

In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later. In any event, as to all expert witnesses not previously disclosed, the court, on its own motion, or on the motion of any party after the first pretrial conference, shall enter an order scheduling the dates upon which all expert witnesses, including rebuttal, shall be disclosed. *** All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence. *** Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." 134 Ill. 2d R. 220(b)(1).

Rule 220 was designed to eliminate late or surprise disclosures of expert witnesses by establishing a uniform, but not inflexible framework for the timely revelation of the identity of expert witnesses and the subject matter of their testimony. (134 Ill. 2d R. 220, Committee Comments, at 179-80.) The plain language of Rule 220 requires the disclosure of expert witnesses within 90 days after the party proffering the witness knows of the substance of the expert's testimony or at the first pretrial conference, whichever is later. (*Barth v. Reagan* (1990), 139 Ill. 2d 399, 417.) As a final precaution, Rule 220 provides that discovery regarding experts will be completed not later than 60 days before the expected trial date. (*Barth*, 139 Ill. 2d at 418.) Rule 220 also allows a court to set its own cutoff dates for the disclosure and discovery of an expert and to bar an expert whose disclosure does not comply with the court-set deadlines. *Knight v. Haydary* (1992), 223 Ill. App. 3d 564, 577.

Here, plaintiffs failed to disclose Carlson within the cutoff dates set by the trial court. The trial court cutoff date was January 14, 1991. Plaintiffs did not disclose Carlson until well after that date, on July 3, 1991. Accordingly, plaintiffs did not satisfy the disclosure requirements of Rule 220 for the disclosure of Carlson. Nonetheless, plaintiffs contend the court should not have barred Carlson because to do so results in a manifest injustice.

The appellate court decisions are not in accord on whether trial courts have discretion in applying sanctions for Rule 220 violations. (See, *e.g.*, Redden, *The Decline of Rule 220: The Rise of Trial by Ambush*, 80 Ill. B.J. 440, 446 (1992).) There even is some discord within districts. In the second district, the court held in the *Phelps* decision that a trial court must bar the testimony of an expert witness whose disclosure violated Rule 220 "unless to do so would create a manifest injustice." (*Phelps*, 159 Ill. App. 3d at 226.) However, in *Vallejo v. Mercado* (1991), 220 Ill. App. 3d 1, the court held that a trial court may consider the conduct of the party in technical violation of Rule 220 and determine whether the party's conduct was unreasonable before imposing sanctions for noncompliance with Rule 220. (*Vallejo*, 220 Ill. App. 3d at 8.) Our supreme court has not resolved this discord, but has discussed factors trial courts use to determine the severity of discovery violation sanctions. *Barth*, 139 Ill. 2d at 420-21.

■■ ■ Because our supreme court discussed these factors and because we believe allowing trial court discretion is the better approach, we will also consider the factors for determining the severity of discovery violations. These factors are: (1) the surprise to the adverse party; (2) the prejudicial effect of the expert's testimony; (3) the nature of the expert's testimony; (4) the diligence of the adverse party; (5) whether objection to the expert's testimony was timely; and (6) the good faith of the party calling the witness. *Barth*, 139 Ill. 2d at 421.

Here it is unlikely that defendants were surprised. Defendants could have expected plaintiffs to proffer another expert to replace Guerard. Although defendants argued they had no knowledge of Carlson's specific identity, they must have expected someone to testify with respect to the standard of care for real estate brokers because plaintiffs, as defendants themselves later argued, needed an expert witness to establish the standard of care. Plaintiffs disclosed Carlson two months before the scheduled beginning of the trial. Defendants could have deposed Carlson before the trial began.

The prejudicial effect of the expert's testimony was great. Without it, plaintiffs could not establish the standard of care; with it, they might have.

The nature of the expert's testimony was straightforward for this kind of case. Parties frequently use experts to establish the standard of care required by professionals who are alleged to have breached professional standards. Here, establishing the standard of care for real estate brokers was critical for plaintiffs. Unless plaintiffs estab-

lished the standard of care and the duty based on that standard of care, plaintiffs would be unable to prove their negligence charge.

There is nothing to show defendants failed to act with diligence in reaction to the disclosure of Carlson. However, plaintiffs argue that defendants waited unnecessarily in raising their objections to Guerard, whom Carlson replaced.

There is nothing to show that plaintiffs failed to act in good faith in calling Carlson. Plaintiffs made timely disclosure and discovery with respect to Guerard. The trial court had previously denied defendants' motion to bar Guerard. When the court granted defendants' second motion to bar Guerard, plaintiffs acted diligently to get a replacement expert witness. Plaintiffs arguably disclosed Carlson before the 60-day cutoff imposed by Rule 220. We find the factors determining the severity of the sanction in this case favor plaintiffs. We therefore conclude that it was an abuse of discretion to bar Carlson's testimony.

We note that the *Knight* court, in commenting on the finding of abuse of discretion in *Vallejo*, concluded that the primary factors for determining the severity of Rule 220 violation sanctions were whether the plaintiff provided an explanation for the delay in securing an expert witness and whether the plaintiff requested a continuance for additional time to conduct discovery. (*Knight*, 223 Ill. App. 3d at 578.) We will therefore also consider these factors.

Here, plaintiffs provided an explanation for the delay in securing an expert on the standard of care for real estate brokers. They had previously disclosed an expert well within the time limits set by the court and believed the expert would be allowed to testify because the court had denied defendants' motion *in limine* seeking to bar the expert's testimony. Only after the court granted a second motion *in limine* seeking to bar the testimony did plaintiffs know their expert could not testify. Once plaintiffs realized this, they proceeded with due diligence to secure another expert. While plaintiffs did not formally request a continuance for additional time to conduct discovery, they thought that was unnecessary because they disclosed the replacement expert two months before the scheduled trial date. Using the *Knight* factors, we conclude it was an abuse of discretion for the trial court to bar Carlson's testimony.

Finally, we conclude that denying Carlson's testimony in these circumstances would be a manifest injustice. Plaintiffs made diligent efforts to secure an expert witness on the critical issue of the standard of care for real estate brokers and attempted to comply with Rule 220. Without an expert witness on this issue, plaintiffs were effectively denied a trial on the merits of the case. Barring plaintiffs' ex-

pert because of a technical violation of Rule 220 in these circumstances would be a manifest injustice.

For all these reasons, we hold that the barring of Carlson's testimony was prejudicial error. The jury verdicts in favor of Kotnaur and Coldwell Banker on the negligence counts (counts III and IV) should be reversed. Plaintiffs are entitled to a new trial on these issues because the subject of the erroneously barred expert testimony, the standard of care for real estate brokers, is an essential element of the negligence claims. The erroneous barring of Carlson's testimony denied plaintiffs an opportunity to prove an essential element of their case.

■ Plaintiffs allege the trial court erred in refusing to tender several jury instructions proposed by plaintiffs in relation to counts III and IV, the negligence counts. These instructions were Nos. 31, 33, 34 and 35. Upon retrial of counts III and IV, the trial court should review these instructions in light of the testimony given by plaintiffs' expert witness on the standard of care for real estate brokers.

The next set of issues on appeal involves alleged violations of the Consumer Fraud Act. Count VIII of plaintiffs' complaint, as amended, charged that Kotnaur, Coldwell Banker, and Van Cura violated the Consumer Fraud Act and thereby caused damage to plaintiffs. After a bench trial on the count VIII claims, the trial judge entered judgment in favor of the defendants. Plaintiffs appeal this judgment with respect to Kotnaur and Coldwell Banker.

Plaintiffs first spoke to Kotnaur in 1985 after Dr. Sohaey was referred to Coldwell Banker through a co-worker. Dr. Sohaey told Kotnaur that he was looking for income-producing property for investment. In early April 1986, plaintiffs made a bid on a shopping center, College Square, which Kotnaur had shown them. The College Square seller rejected plaintiffs' bid because another buyer's bid had already been accepted. Within days, Kotnaur proposed another shopping center, Market Square, to plaintiffs. Plaintiffs testified that Kotnaur said Market Square was a much better deal than College Square.

After plaintiffs toured Market Square with Kotnaur in late April 1986, Kotnaur provided plaintiffs with *pro formas* concerning Market Square. Coldwell Banker had prepared these documents. The *pro formas* consist of two pages and contain five parts. Part 1, entitled "ASSUMPTIONS," contains several items of information including information as to the status of the mortgage plaintiffs would assume as part of the transaction, several statements such as "real estate taxes are projected to increase by 5% each year," and a 10-year projection of likely rental rates per square foot. Part 2 shows a list of

Market Square tenants, annual rent projections based on square footage for each tenant for each of the years 1986 through 1995, and total Market Square rental income for each of those years allowing for a 5% vacancy rate. Part 3 gives a brief estimate of the expenses per square foot for each of the years 1986 through 1995. Part 4 gives a *pro rata* breakdown by tenant of rental income and total "net reimbursement" for each of the years 1986 through 1995. Part 5 gives an income summary for each of the years 1986 through 1995 and indicates that Market Square should produce sufficient income to meet expenses in each year with the surplus cash flow increasing each year. Plaintiffs contend the *pro formas* contain misrepresentations which constitute violations of the Consumer Fraud Act.

Kotnaur sent plaintiffs a letter concerning Market Square dated May 23, 1986 (the Personal Designs letter). In part, the Personal Designs letter stated:

"In the interest of full disclosure, [sellers] want you to be aware that, due to some supplier problems, one of their tenants, Personal Designs, was experiencing some financial difficulties. They met with the tenant yesterday to determine the current status of the tenant. The tenant indicated that their supplier problems had been corrected and that sales volume had showed steady increases. They indicated that sales volume for last month was approximately $45,000. This is considered to be very good volume for a non-mall store. Traditionally, clothing sales volumes are stronger in the Fall and Winter months than in Spring, so this volume at this time of year is considered a good sign."

Donald Rouse, the owner of Personal Designs, testified at the trial that Personal Designs experienced financial difficulties and that he only made one monthly rent payment for Personal Designs between the time Personal Designs moved into Market Square, in December 1985, and May 1986. The Market Square management renegotiated the Personal Designs lease in May 1986. Rouse testified he might have told Market Square management that his supply problems were improved and that sales volume was increasing, but never told anyone sales volume was $45,000 for any month.

Plaintiffs contend that Kotnaur was their real estate broker for the Market Square transaction and that the Consumer Fraud Act applies to representations made by real estate brokers to purchasers of real estate. Plaintiffs argue that Kotnaur violated the Consumer Fraud Act when he gave them the *pro formas* and when he sent them the Personal Designs letter. Plaintiffs maintain that in giving them

the *pro formas* Kotnaur violated the Consumer Fraud Act by communicating unsupportable information received from Coldwell Banker containing financial information regarding Market Square without explaining to plaintiffs how the information was prepared, how the preparer arrived at the purchase price, and why certain vacancy and capitalization rates were used. Plaintiffs argue that Kotnaur also violated the Consumer Fraud Act when he sent them the Personal Designs letter because it contained false information with respect to Personal Designs general condition and a false statement regarding the monthly sales volume of $45,000.

Defendants contend that neither Kotnaur nor Coldwell Banker violated the Consumer Fraud Act. First, Kotnaur denies that he was plaintiffs' real estate broker for the Market Square transaction. Kotnaur testified he represented the sellers in the transaction. In addition, defendants argue that none of the conduct cited by plaintiffs constituted a violation of the Consumer Fraud Act. Defendants assert that the information in the *pro formas* was not a representation but merely a projection which is not actionable.

Defendants assert that Kotnaur's letter to plaintiffs regarding Personal Designs disclosed that Personal Designs was having financial problems. Although the letter stated Personal Designs had a good month, defendants argue that the letter should have acted as a "red flag" to plaintiffs 10 weeks before the closing when plaintiffs could have easily withdrawn their offer to purchase Market Square. Defendants also assert that even if the letter contained misrepresentations they were not material. Defendants also contend the record shows other possible causes of plaintiffs' economic losses and a lack of due diligence on the plaintiffs' part. Finally, Kotnaur contends he corrected any misinformation which might have been received by plaintiffs in the Personal Designs letter when, two weeks before the closing, he sent plaintiffs rent rolls which showed Personal Designs had not paid rent and had signed a new lease effective June 1, 1986.

Section 2 of the Consumer Fraud Act provides as follows:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby de-

clared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." Ill. Rev. Stat. 1989, ch. 121½, par. 262.

■■■ Because section 2 of the Consumer Fraud Act was intended to give consumers broader protection than the common-law action of fraud, a plaintiff under the Consumer Fraud Act need not show actual reliance on or diligence in ascertaining the accuracy of misstatements. (*Harkala v. Wildwood Realty, Inc.* (1990), 200 Ill. App. 3d 447, 453.) The good or bad faith of the seller is irrelevant under the Consumer Fraud Act; consequently, a plaintiff can recover for even innocent misrepresentations. (*Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 182-83.) The Consumer Fraud Act applies to a real estate broker's representations to prospective purchasers of real estate. *Munjal,* 138 Ill. App. 3d at 183.

However, the Consumer Fraud Act only imposes liability upon a real estate broker if the broker knew of the false, misleading or deceptive character of the information. (*Connor v. Merrill Lynch Realty, Inc.* (1991), 220 Ill. App. 3d 522, 530-31.) There is no breach of duty under the Consumer Fraud Act unless the broker could have discovered the falsity of the representation by the exercise of ordinary care. (*Harkala,* 200 Ill. App. 3d at 454.) Generally, a broker has no duty to prospective buyers of real estate to independently substantiate the representations of a seller unless the broker is aware of facts that such a representation is false. (*Zimmerman v. Northfield Real Estate, Inc.* (1986), 156 Ill. App. 3d 154, 163-64.) The Consumer Fraud Act should not be used to turn nondeceptive and nonfraudulent statements or omissions by real estate brokers into actionable affirmations. (*Harkala,* 200 Ill. App. 3d at 453.) Mere expressions of opinion will generally not support an action under the Consumer Fraud Act. (*Sampen v. Dabrowski* (1991), 222 Ill. App. 3d 918.) Statements relative to future or contingent events, expectations, or probabilities are generally regarded as mere expressions of opinion or conjectures. *3700 S. Kedzie Building Corp. v. Chicago Steel Foundry Co.* (1959), 20 Ill. App. 2d 483, 487.

Here, the *pro formas* Kotnaur gave to plaintiffs are in the nature of expressions of opinion. In the section marked "ASSUMPTIONS" at least seven different assumptions are shown including the assumption that vacant properties will have a yearly rent increase equal to the Consumer Price Index (CPI), that the CPI will be a certain

amount, and that the vacancy rate will be a certain amount. Moreover, the *pro formas* are clearly addressing future events. The *pro formas* show projections in several categories for the 10-year period from 1986 through 1995. Kotnaur gave the *pro formas* to plaintiffs early in 1986. Thus, the yearly figures were for the then-current uncompleted year and the next nine years. We conclude that the *pro formas* were expressions of opinion with respect to future events and therefore were not actionable under the Consumer Fraud Act.

Whether Kotnaur was plaintiffs' real estate broker is a false issue here. Kotnaur admits he was a broker and received a broker's commission for the Market Square transaction. The Consumer Fraud Act requires that any real estate broker refrain from making false, misleading or deceptive representations to prospective buyers of real estate. Hence, Kotnaur had a duty under the Consumer Fraud Act to refrain from making false, misleading, or deceptive representations regarding Market Square to plaintiffs.

We disagree with Kotnaur's contention that the information in the Personal Designs letter was not material. Information is material if it relates to a matter upon which a party could be expected to rely in deciding whether to engage in the conduct in question. (*Zimmerman*, 156 Ill. App. 3d at 162.) Here, plaintiffs were deciding whether to buy income-producing property. Where, as in this case, a tenant of the property was not paying rent or was experiencing financial difficulties which might jeopardize rent payments and the rent payments went directly to the production of income, then the nonpayment of rent was material.

We also disagree with Kotnaur's contention that plaintiffs failed to exercise due diligence in determining the truth of the representations in the Personal Designs letter and therefore the Consumer Fraud Act does not apply. Under the Consumer Fraud Act, a plaintiff need not show diligence in ascertaining the accuracy of misstatements.

There is a dispute as to whether the Personal Designs letter contained misstatements. Plaintiffs argue that the $45,000 figure in the letter was false and support their argument with the testimony of Rouse, the owner of Personal Designs, that he never told anyone his sales volume was $45,000 in any month. Kotnaur denies the figure was false.

Assuming, *arguendo*, that the figure was false, the critical question in determining whether Kotnaur violated the Consumer Fraud Act when he sent plaintiffs the Personal Designs letter is whether he knew or should have known the information in the letter was false,

deceptive, or misleading. The Personal Designs letter indicated and Kotnaur testified that he got the information in the letter from the sellers, KDG. Kotnaur testified that he did not attempt to verify the information.

Plaintiffs have failed to show that Kotnaur was aware of any facts suggesting that KDG's representations were false when Kotnaur wrote the Personal Designs letter. Therefore, plaintiffs have failed to show that Kotnaur should have attempted to verify the information he received from the sellers.

In a bench trial, the judgment of the trial court will not be disturbed unless it is against the manifest weight of the evidence. (*Sexton v. Smith* (1986), 112 Ill. 2d 187, 194.) Where there is conflicting testimony, the trial judge is in a better position than a court of review to observe the demeanor of the witnesses, judge their credibility, and determine the weight their testimony should receive. (*In re Application of County Treasurer* (1989), 131 Ill. 2d 541, 549.) A reviewing court may not substitute its opinion for that of the trial court, especially where the trial court had the opportunity to observe the witnesses and determine their credibility. *Smith v. Jack Nicklaus Development Corp.* (1992), 225 Ill. App. 3d 384, 390.

■■■ In this case, many of the facts were disputed. The trial court had an opportunity to observe the witnesses and assess their credibility. Based on the evidence in the record, the trial court should have concluded, as we have, that the *pro formas* were not actionable under the Consumer Fraud Act because they were mere expressions of opinions with respect to future events. The trial court could also have concluded that neither Kotnaur nor Coldwell Banker knew that the statements in the Personal Designs letter may have been false. Plaintiffs have not shown that Kotnaur had a duty to inquire into the information he testified he received from sellers. Although the Personal Designs letter could be viewed as conveying the message that any problems Personal Designs may have had were now rectified, the letter also clearly notified plaintiffs that Personal Designs had problems. Almost two weeks before the closing, Kotnaur sent plaintiffs additional information, the rent rolls, which showed the rental status of all the Market Square tenants including Personal Designs. Thus, Kotnaur sent plaintiffs information showing the actual rental status of Personal Designs well before the closing. Under these circumstances, we will not disturb the judgment of the trial court.

Plaintiffs' next issue on appeal contends that the trial court erred when it directed verdicts in favor of Kotnaur and Coldwell Banker on counts VI and VII of plaintiffs' complaint as amended and supple-

mented. In their complaint, plaintiffs titled these counts "intentional torts." The specific allegations made it clear that count VI, against Kotnaur, sounded in civil conspiracy. Although less clear, count VII, against Coldwell Banker, incorporated many of the conspiracy allegations set forth in count VI.

The trial court gave plaintiffs an opportunity to clarify counts VI and VII. Plaintiffs' counsel, apparently conceding that count VI was really a civil conspiracy count, argued that although there had been no testimony directly establishing a conspiracy, the jury could deduce a conspiracy from the evidence of the conduct of Kotnaur and Van Cura and the documents introduced to show the correspondence between Kotnaur and Van Cura. The court also asked plaintiffs to point to evidence showing an underlying illegal or unlawful act which was the basis of the conspiracy. Plaintiffs' counsel again argued that the jury could deduce such an act from the evidence already before them.

Count VII incorporated most of the allegations of count VI, including those sounding in civil conspiracy. Nonetheless, plaintiffs argued it was not a conspiracy count but involved "a willful and wanton tort." When the court asked plaintiffs to be more specific, plaintiffs argued the count alleged "intentional fraud." Defendants immediately objected that "fraud" had not previously been charged and it was too late to introduce it.

The court found that Illinois does not recognize a tort simply called "intentional tort" and that plaintiffs had made no clear and convincing showing of conspiracy. The court concluded that even if the *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494) were applied without a requirement of clear and convincing evidence, plaintiffs had failed to prove counts VI and VII. Based on this reasoning, the trial court directed verdicts in favor of Kotnaur on count VI and Coldwell Banker on count VII.

■■■ Courts may only enter directed verdicts when all the evidence viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 139-40, citing *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) Here, plaintiffs' allegations of civil conspiracy did not show facts upon which the allegations were based, but merely conclusions. This is not enough to prove civil conspiracy. (*Douglass v. Wones* (1983), 120 Ill. App. 3d 36, 44.) Based on our review of the evidence in the light most favorable to plaintiffs, we find the evidence insufficient to support a charge of civil conspiracy and no contrary verdict could ever stand. Plaintiffs simply did not specifically show any under-

lying illegality or illegal conduct upon which a conspiracy might be based and did not show an agreement to conspire. We therefore affirm the directed verdicts entered by the trial court on counts VI and VII.

We next consider plaintiffs' appeal of the directed verdict in favor of Coldwell Banker on its counterclaims. In the counterclaims, Coldwell Banker sought recovery from plaintiffs for two lease commissions in the total amount of $18,741. Count I of the counterclaim was a *quantum meruit* claim and count II alleged a written contract in the form of a management agreement.

At trial, Coldwell Banker adduced evidence showing that pursuant to the written management agreement it had procured two tenants for plaintiffs. It also introduced expert testimony that the total fee for these services was fair and reasonable.

Plaintiffs conceded the existence of the management agreement and the leasing fee provision in the agreement. At trial, plaintiffs argued that the schedule specifying the fees was never attached to the contract and therefore the contract was not enforceable. However, in their answer to the counterclaims, plaintiffs acknowledged the agreement was enforceable despite the missing fee schedule. Plaintiffs did not contest the reasonableness of the fees asserted by Coldwell Banker. Plaintiffs essentially argued they should not have to pay the fees because the need for new tenants arose from misrepresentations by Coldwell Banker. Thus, the gist of plaintiffs' argument for nonpayment of the fees was their case in chief. Plaintiffs were unable to cite any authority for this position.

The trial court concluded that Coldwell Banker was entitled to the fees on either of the grounds they asserted in their counterclaim and directed a verdict in favor of Coldwell Banker.

We affirm the directed verdict in favor of Coldwell Banker. Plaintiffs did not dispute the existence of the contract, the performance by Coldwell Banker pursuant to the contract, or the determination of the fees owed under the contract. Plaintiffs have not cited any authority for their position that they are not required to pay the fees notwithstanding the contract. Where the appellants fail to cite relevant legal authority, the appellants have not satisfied Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)) and appellants' arguments do not merit consideration on appeal. (*Rockford Memorial Hospital v. Schueler* (1988), 167 Ill. App. 3d 358, 362.) Here, in the absence of relevant authority to the contrary the undisputed contract must govern. Accordingly, we affirm the directed verdict in favor of Coldwell Banker on its counterclaims.

In summary, based on the above, we affirm the jury verdicts in favor of Van Cura on counts I and II of plaintiffs' complaint. We affirm the summary judgments in favor of the MBC defendants on counts X and XI of the complaint. We affirm the directed verdicts entered in favor of Kotnaur and Coldwell Banker on counts VI and VII of the complaint and in favor of Coldwell Banker on counts I and II of its counterclaim. We affirm the judgments entered by the trial court in favor of Kotnaur and Coldwell Banker on count VIII. We reverse the jury verdict in favor of Kotnaur and Coldwell Banker on counts III and IV of plaintiffs' complaint and remand for a new trial on counts III and IV.

Affirmed in part; reversed in part and remanded.

INGLIS, P.J., and DOYLE, J., concur.