# Illinois Official Reports

## Appellate Court

---

**_Brettman v. Virgil Cook & Son, Inc._, 2020 IL App (2d) 190955**

---

| | |
|---|---|
| Appellate Court Caption | DEREK BRETTMAN, Individually and as Guardian of Gina Brettman, a Disabled Person, Plaintiff-Appellant, v. VIRGIL COOK & SON, INC., and PLOTE CONSTRUCTION, INC., Defendants-Appellees. |
| District & No. | Second District<br>No. 2-19-0955 |
| Filed | September 28, 2020 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 15-LA-76; the Hon. Thomas A. Meyer, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Milo W. Lundblad, of Brustin & Lundblad, Ltd., of Chicago, for appellant.<br><br>John W. Patton Jr., Kelly L. Ferron, Emma L. Knowles, and Christina V. Chen, of Patton & Ryan LLC, and Melinda S. Kollross, Brian J. Riordan, and Paul V. Esposito, of Clausen Miller P.C., both of Chicago, for appellee Virgil Cook & Son, Inc.<br><br>Julie A. Teuscher, Thomas P. Boylan, and Yaro M. Melnyk, of Cassiday Schade LLP, of Chicago, for other appellee. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, Derek Brettman, individually and as guardian of Gina Brettman, filed a negligence suit against defendants, Virgil Cook & Son, Inc. (Virgil Cook), and Plote Construction, Inc. (Plote), alleging that their negligent placement of temporary traffic control lights proximately caused truck driver Israel Vela to run a red light and strike Gina's vehicle. All three of the temporary lights controlling Vela's movement were placed higher than was mandated by what were, at least arguably, the controlling regulations. Vela testified in deposition that, as he approached the intersection, he saw only permanent traffic lights, which were covered with tarps. He slowed down and looked for an alternate instructive signal, such as a stop sign, but he did not see any. Believing that he had the right-of-way, he "rolled" through the intersection, finally seeing the temporary traffic light, which was red, at or near the moment he struck Gina's vehicle.

¶ 2        Defendants moved for summary judgment. Brettman filed, pursuant to Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013), an affidavit in opposition to summary judgment by his expert, Dr. David Noyce. Pointing to Vela's testimony, as well as other facts in the record and his personal knowledge of the limitations of human perception of traffic flow (based on 30 years of research on the topic for the University of Wisconsin), Noyce opined that the improper placement of the traffic lights made it difficult for Vela, or any driver, to see them in time to react appropriately.

¶ 3        The trial court struck Noyce's affidavit, in part, stating: "So I am going to strike [portions of Noyce's] affidavit for the reasons I discussed earlier, which then I felt that [Noyce] was rendering opinions rather than introducing facts." Then, for the purposes of summary judgment, the trial court accepted that defendants breached a duty to place the traffic lights at the appropriate height. However, the court determined that the negligent placement of the lights was a condition but not a cause of the accident, stating: "[the] lights might have been too high, but there's no evidence that their height prevented [Vela] from seeing them as he approached the intersection." The court granted summary judgment to defendants.

¶ 4        Brettman appeals the trial court's decision to strike portions of Noyce's Rule 191 affidavit. We recognize that the admission standard for an expert's Rule 191 affidavit is more stringent than the admission standard for that same expert's testimony at trial, in that Rule 191 requires the expert to disclose the specific facts (or personal knowledge) supporting his or her opinion in an affidavit, whereas, at trial, the expert may give an opinion without disclosing the facts underlying that opinion (*Robidoux v. Oliphant*, 201 Ill. 2d 324, 334-35, 338 (2002)). However, we determine that Noyce's affidavit met that more stringent standard. At the Rule 191 hearing, defendants argued that the facts upon which Noyce based his opinion were not facts at all but were, instead, speculation and conjecture. They also argued that the record refuted the facts upon which Noyce based his opinion, specifically, that Vela admitted to seeing the traffic lights. The trial court then appeared to hold the affidavit to an incorrect standard, stating that Noyce could not offer an opinion at all and could offer only facts. We determine that Noyce

properly based his opinion on specific facts and personal knowledge. That the underlying facts were disputed does not render them speculative. An expert may base his or her opinion on a disputed fact, so long as there is enough evidence to raise a jury question as to that fact. *Murphy v. General Motors Corp.*, 285 Ill. App. 3d 278, 282 (1996). The trial court erred in striking portions of the affidavit. A single caveat, concerning the distinction between an ultimate issue and a legal conclusion, remains, however, which we will address at the end of the Rule 191 analysis.

¶ 5 Brettman also appeals the grant of summary judgment to defendants. Particularly with Noyce's affidavit, but even without it, we determine that a genuine issue of material fact remains as to whether defendants' negligent placement of the temporary traffic control lights proximately caused the traffic accident. It cannot be said that, as a matter of law, the lights were plainly visible to drivers. As such, it cannot be said that, as a matter of law, Vela's failure to see the lights in time to react appropriately was an independent force breaking the causal connection between defendants' negligent placement of the lights and the accident. We reverse and remand.

¶ 6 # I. BACKGROUND

¶ 7 This matter arises out of the March 12, 2014, traffic accident between Vela and Gina. The accident occurred at the intersection of Illinois Route 47 and Kreutzer Road in Huntley, which was then under construction. It was 20 degrees Fahrenheit, winds were blowing at 20 miles per hour, and snowplows were clearing the roads from the snow that had fallen the day before. Vela, who had just driven from Texas to deliver a load of goods, traveled south on Route 47 in his tractor-trailer. Gina traveled east on Kreutzer Road and was making a left turn onto northbound Route 47 when Vela struck her vehicle. Vela did not see the temporary red light until it was too late to stop.

¶ 8 Brettman filed a myriad of negligence suits. He filed suit against Vela and his employer, which, to our knowledge, remains pending. He filed suit against the shipper of the product Vela delivered and the broker that arranged the trip, which was resolved in a summary judgment for the shipper and the broker. See *Brettman v. M&G Truck Brokerage, Inc.*, 2019 IL App (2d) 180236, ¶ 1 (summary judgment affirmed). He filed suits against various entities involved in the construction of the intersection, many of which have ended in settlement.

¶ 9 More closely related to the instant case, Brettman filed suit against Christopher B. Burke Engineering, Ltd. (Burke), the company hired by the Village of Huntley to oversee the project, including the installation of the temporary traffic lights. The Burke suit was resolved in a summary judgment for Burke. That ruling was not appealed, or has not yet been appealed, as no finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) was entered. The trial court made comments during the Burke summary judgment hearing that the defendants in the present case would later rely upon. The court primarily determined that Burke owed no duty to Gina, as determined by the scope of its contract with Huntley. However, the court also stated that any failure on Burke's part to ensure that the lights were placed according to specification did not proximately cause the accident. Mirroring language set forth in *Briske v. Village of Burnham*, 379 Ill. 193, 199 (1942), the court stated:

> "With respect to the placement of the lights, I felt that that merely created a condition, and, as such, could not be a proximate cause of this accident.

There was no evidence to suggest that the light was not visible to [Vela] as he drove on Route 47. It was just not where he expected it to be.

*  *  *

Let me rephrase that. They weren't at the level that [the Illinois Department of Transportation's (IDOT's)] specifications require, but at all times, the evidence that I have is that they were visible.

*[Vela] just failed to see that which was readily visible at all times* as he proceeded south in this intersection *** [and that] tells me that the placement of the lights can't be a proximate cause of this accident." (Emphasis added.)

¶ 10    Finally, Brettman filed suit against defendants here. Plote had been hired by IDOT and was the general contractor for the intersection construction project. Plote, in turn, hired Virgil Cook to tear down the old lights, erect temporary replacements, and, ultimately, install new permanent traffic lights. Again, Brettman would allege that Plote and Virgil Cook negligently installed the temporary lights by placing them higher from the ground than controlling regulations allowed, which caused Vela to be unable to see the light in time to react appropriately.

¶ 11    In early July 2013, Virgil Cook tore down the old traffic lights. In late July 2013, Virgil Cook hung the temporary lights. John Janikowski, an IDOT engineer, inspected the temporary lights for turn-on. He did not have a specific memory of the event. However, typically, he does not measure the top height of the temporary lights. Instead, he observes their general visibility.

¶ 12    In January 2014, Virgil Cook constructed the new traffic support poles and intersection arms, covering the still nonoperational signal heads with tarps. Virgil Cook planned to transition from the temporary lights to the permanent lights in early March 2014. However, bad weather delayed the plan. Therefore, on the date of the accident, motorists approaching the intersection saw duplicate traffic signal heads, one covered with a tarp and the other, higher up, operational.

¶ 13    The parties agree that the controlling regulations require all *permanent* signal heads (to be not more than 25.6 feet above the pavement (from the top of the signal housing). The parties dispute whether those regulations apply to all *temporary* signal heads. The parties also dispute whether, even if those regulations do not apply to all temporary signal heads, those regulations still apply to the temporary signal heads contracted for in this case. All three of the temporary signal heads controlling Vela's movement on the day in question were more than 25.6 feet above the pavement—at 26.5 feet above the pavement (southbound, far left), 29 feet above the pavement (southbound, far right), and 32 feet above the pavement (southbound, near right). Vela drove in the southbound, far right lane, with the signal 29 feet above the pavement, 3.4 feet higher than the 25.6-foot standard.

¶ 14    More specifically as to the height regulations, in March 2011, IDOT adopted the 2009 Manual on Uniform Traffic Control Devices (MUTCD), produced by the Federal Highway Administration. IDOT's contract with Plote stated that "the latest edition of [the MUTCD] for streets and highways" would "apply to and govern the construction" of the project. The MUTCD provides, in section 4D.15: "The top of the signal housing of a vehicular signal face located over any portion of a highway that can be used by motor vehicles *shall* not be more than 25.6 feet above the pavement." (Emphasis added.) The MUTCD also provides that the signal heads shall be at least 15 feet above the pavement. Section 4D.15 does not specify

whether it applies to temporary signals. Section 4D.32 specifically addresses temporary signals, and it is silent as to height requirements. However, it states that the temporary signal "shall meet the physical display and operational requirements of a conventional traffic control signal." Section 18.09 of the MUTCD provides that the manual should not be a substitute for "engineering judgment." Also, the project plans state that the temporary signals were to be placed "as indicated on the temporary traffic signal plan *or as directed by the engineer.*" (Emphasis added.)

¶ 15    Several witnesses testified that the 25.6-foot height limitation applied to temporary signals. Janikowski testified to a document entitled "[IDOT] District 1 Notes *for Temporary Signals.*" (Emphasis added.) Appendix B, Note 5, of those documents requires that the top of a signal be no more than 25.6 feet above the pavement, the same height as set forth in the MUTCD. (Huntley is in IDOT District 1.) Dennis Guge, an engineering technician who has worked for IDOT for 40 years and who reviewed the plans for the subject intersection, testified that the MUTCD's 25.6-foot maximum height limitation applies to wire-mounted as well as permanent signals. He also testified that, although the MUTCD states the minimum height shall be at least 15 feet above the pavement, the instant project plans called for a minimum height of 17 feet.

¶ 16    Several project documents show a minimum height of 17 feet, but they do not show a maximum height specification. Joseph Emery, a registered engineer who worked for CivilTech Engineering, another company involved in the project, testified that the MUTCD height limitation does not apply to temporary signals.

¶ 17    Although Guge and Emery differed on whether the height limitation applied to temporary signals, both testified that the purpose of the height limitation is to maximize visibility. Guge stated that the height limitation places the signal in the driver's field of vision. Emery testified that a signal that is too high above the ground could be outside the driver's field of vision, create an unsafe condition, and lead to an accident.

¶ 18    Vela testified via deposition. Prior to the accident, he had just completed a delivery of cucumbers to the Kraft Claussen pickle plant. His employer instructed him to take Interstate 90 to the nearest rest stop before receiving further instructions about his next load. Before he reached Interstate 90, and about 25 miles from the Kraft Claussen pickle plant, he collided with Gina at the Route 47 and Kreutzer Road intersection. Vela drove south on Route 47 at the posted speed limit of 45 miles per hour. He intended to continue going straight, through the intersection. As he approached the intersection, he saw the permanent signals, which were covered by tarps. He then looked for a different instructive signal, slowing down to 30 to 35 miles per hour. He could not see any instructive signal, so, believing that he had the right-of-way, he continued to "roll" through the intersection. While in the intersection, he saw the temporary signal above his lane. It was not hanging straight down. He saw the signal too late. He was unable to brake or swerve, because "[i]t all happened so fast."

¶ 19    Vela testified:

    "Well, all I recall is I was driving and I saw the lights that were covered and I tried to see if there were any stop signs because usually they put stop signs whenever a signal light is not working. That's why I was rolling, I kept rolling. I never saw any stop signs. And the signal lights that were up there were covered with some kind of tarp. And when I was at about the middle of the intersection, that's when I saw a vehicle approaching. And that's when I saw—when I saw, like, some other sets of lights but the wind was—

I saw them, like—they were not straight down. They were like up. But it was you know, that's when I hit the car."

And:

"Well, usually when—when [the permanent lights] are covered like that with something—the way it is right there, usually they have stop signs because the signal lights are not working. So you look for a stop—I never saw any stop signs or nothing."

¶ 20 After the accident, Vela told a police officer that it was his fault. Vela was ticketed for disobeying a traffic control device, and he pleaded guilty to that charge.

¶ 21 Gina could not testify to the accident, because it left her disabled. However, several witnesses were able to testify both to the accident and to the condition of the intersection that day. Except as noted, they described the accident consistently with Vela. These witnesses were Michael Karels, Jeffrey Parkity, Kelsey Bennet, and Laura Forty.

¶ 22 Karels was traveling south on Route 47, directly behind Vela's truck. Karels saw the red light and slowed to a stop, but Vela never stopped. Karels traveled through the construction-zone intersection on a daily basis, and he never had difficulty seeing the temporary traffic lights.

¶ 23 Parkity was traveling north on Route 47. He was unable to observe the color of the traffic light in Vela's direction of travel. However, Parkity had traveled through the intersection at least 10 times in the months before the accident without difficulty seeing the lights.

¶ 24 Bennett had entered the construction-zone intersection 50 times from the north and 50 times from the south. She never experienced confusion at the intersection. She never had trouble seeing the temporary traffic lights. On the day in question, Bennett drove south on Route 47. She saw the red light 75 feet before the intersection. At that point, she had already entered the right turn lane and decreased her speed "really slow" due to weather conditions.

¶ 25 Forty testified that, moments before the crash, a driver in a small car also failed to see the temporary light in time.

"A. Right before the green arrows came on, there was a small car that—I'm not sure the make and model, possibly a Honda Accord—had come through what would have been a very yellow or just-red light. She stopped in the middle of the intersection, dead in front of me, looked around, looked at me—excuse my language—said oh s***, and then proceeded through the intersection.

Q. All right. What direction was that car headed?

A. She was headed south on 47.

Q. So the car would have come from your right and gone to your left?

A. That's correct.

Q. And is it your recollection that this car came to a complete stop, you said?

A. Just about a complete stop. I mean it was like an, oh, my gosh, I'd gone through the light, stop, I'm already half-way through [the] intersection, I-better-get-out-of-it type movement."

Forty took note of the occurrence, because she ordinarily turned left with the green arrow at that intersection: "I thought to myself, oh, my gosh, if I had turned there, that would have been close. *** But I had to stop for a muffin that day, so I was going straight." Moments after the

driver in the small car failed to stop in time, Vela made the same mistake, only he crashed into Gina, who was turning left with the green arrow.

¶ 26     Other witnesses, who had not seen the accident, were able to testify to the condition of the construction-zone intersection. Detective Kevin Keane noted in his supplemental police report that, on the way to the crash site, he observed that the temporary signals were "dim and a bit hard to see," though the colors were visible. Police sergeant Joseph Willard testified that he also traveled through the intersection in the weeks prior to the accident, and he never had difficulty seeing the temporary signals. Finally, Brettman testified that he traveled through the intersection as often as three times per day, and he did not recall ever being confused by the temporary signals.

¶ 27     As stated, Brettman sued defendants in negligence, alleging that the improper placement of the temporary lights proximately caused the accident. Defendants moved for summary judgment.

¶ 28     Brettman filed four affidavits in opposition to summary judgment, by experts Dr. Jay Przbyla, Noyce, Dr. Jeffrey Buckholz, and Frank Burg. The trial court accepted Przbyla's affidavit without objection. On defendants' motions, the court struck Noyce's, Buckholz's, and Burg's affidavits. Brettman appeals the striking of only Noyce's affidavit, so we do not detail Buckholz's or Burg's affidavits.

¶ 29     Przbyla averred that he earned a B.S. in civil engineering from Brigham Young University and a Ph.D. in transportation safety engineering from the University of Utah. Since 2005, he has worked for three engineering firms specializing in transportation engineering. He has been certified as a temporary traffic control supervisor, is an accredited accident reconstructionist, and is familiar with the standard of care as well as custom and practice in the industry. He has testified in other trials and depositions concerning accident reconstruction and transportation safety.

¶ 30     Przbyla reviewed, among other documents, the MUTCD standards and the project plans. The purpose of the MUTCD standards is to provide "uniformity and consistency in the *** location of traffic signals encountered by motorists and *to provide motorists with visual information within their field of view so that they have the information they need at the time they need it.*" (Emphasis added.) Przbyla believed that both the MUTCD standards and the project plans required the top height of the temporary control signals to be no more than 25.6 feet above the pavement.

¶ 31     Przbyla conducted a photogrammetry study, in which he extracted three-dimensional measurements of the subject traffic signals. The vertical heights of all three temporary signals controlling southbound traffic were in violation of the MUTCD standards and the project plans and documents. Those top heights were 26.5 feet above the pavement (far left), 29 feet above the pavement (far right), and 32 feet above the pavement (near right). Additionally, the lateral positions of two of the three southbound temporary signals were not as required in the project plans.

¶ 32     Przbyla noted that Forty witnessed another driver run the same red light just prior to the accident. Also, video from a nearby Walgreens camera confirmed that "conflicting vehicle movements happen[ed] concurrently" around the time of the accident.

¶ 33     Przbyla opined that the failure to comply with the MUTCD and the project plans led to a "confusing situation" and that the "deficiencies in the subject traffic signals were directly related to the collision sequence and [were] a primary factor leading up to the collision."

¶ 34     The Noyce affidavit consisted of five paragraphs, plus attachments. In paragraph 1, Noyce set forth his qualifications. Noyce earned a B.S. and an M.S. in civil and environmental engineering from the University of Wisconsin-Madison; he earned a Ph.D. in civil engineering from Texas A&M University. He is currently the department chair for civil and environmental engineering at the University of Wisconsin-Madison. For the past 34 years, he has designed roadway systems and performed academic research on transportation design, including traffic control devices and human factors. He has conducted nearly 200 research studies at the University of Wisconsin on transportation safety, traffic signal operations, and human factors.

¶ 35     In paragraphs 2, 4, and 5, Noyce listed the materials and exhibits upon which he based his opinions and conclusions. He also incorporated by reference his report, a 17-page document, wherein he explained in further detail the portions of the record and the academic concepts supporting his opinions and conclusions, with citation to and quotation from published scientific authority.

¶ 36     Specifically, in his report, Noyce (1) calculated the time available to process the temporary light and (2) explained scientific concepts regarding (a) driver expectancies, (b) useful fields of view, and (c) inattentional blindness.

¶ 37     Noyce calculated that Vela had 12 seconds from the sign warning that a construction zone was ahead before he reached the intersection to view the temporary light and respond appropriately. Noyce provided the formula for his calculation, noting that the sign was 800 feet from the intersection and that a vehicle travelling at 45 miles per hour, or 66 feet per second, had 12 seconds before reaching the intersection. (Vela had testified in deposition that he had been driving the posted speed limit of 45 miles per hour before slowing down closer to the intersection.) Noyce further stated that, practically, Vela had even less than 12 seconds because the road curved such that the intersection would not have been visible from the location of the sign. Noyce included an aerial photograph illustrating the road curvature.

¶ 38     Noyce explained that drivers take more time to process and respond to traffic arrangements that violate drivers' expectancies. In support of this point, Noyce cited to the studies of other researchers, providing graphs and citations. He also pointed to and cited his own study, which included heat maps to show driver attention. His study showed that, when *expected* traffic signal information is not available, drivers tend to look closer to *ground level* for information to assist in their decision making, including looking for other traffic signs. He attached examples of his heat maps. (Vela had testified that, when he did not see an operational signal, he looked, we infer, *lower* for a traditional stop sign. Vela had also testified that he looked for what he *expected* to see, a stop sign.) When drivers' expectancies are violated, they spend time searching for critical objects, and their cognitive workload increases. Again, Noyce provided a citation for this concept.

¶ 39     Noyce further explained that, when drivers work harder to process information, their useful field of view diminishes. The diameter of drivers' useful field of vision decreases, creating a larger peripheral zone. Noyce attached several diagrams from his own research and from other researchers, providing citation, showing a decrease in the useful field of vision and an increase in the peripheral zone.

¶ 40    Finally, Noyce explained the concept of inattentional blindness, or look-but-fail-to-see. Inattentional blindness occurs when drivers fail to notice an unexpected object that is fully visible. Other drivers might readily see it if they are looking for it. Noyce cited to studies to validate the concept, including a famous study where 50% of participants who were asked to count the number of basketball bounce passes versus the number of throw passes in a video failed to notice a person in a gorilla suit strolling through the scene. The participants expected to see basketball passes, not a gorilla. Distinguishing between bounce and throw passes required a reasonable amount of attention. As applied to a traffic scenario, drivers do not always notice objects outside their primary focus. Drivers experiencing a high cognitive workload due to expectancy violations might not process an important object in time to react appropriately.

¶ 41    In paragraph 3, subparagraphs a through m, Noyce set forth his opinions and conclusions, the bases for which were set forth in his attached written report, as well as in paragraphs 2, 4, and 5. These subparagraphs stated:

"a. The State Route 47 southbound approach to the Kreutzer Road intersection was an extremely complex intersection because of the roadway approach geometry, the construction work zone activity, the array of traffic control devices to comprehend, the short amount of time available for information processing, and the unexpected and inconspicuous mounting location of the temporary traffic signals.

b. At least two perception/response time intervals were needed to identify the correct traffic control information.

c. The location, size, reported dimness, and dynamic movement of the temporary traffic signals due to the extreme weather conditions on March 12, 2014, aggravated the visual complexity and Mr. Vela's ability to observe the traffic signals.

d. Beyond the obvious problems of the temporary traffic signals being placed at a height and location that violated the requirements of the [MUTCD], numerous components of human factors science explain the significant cognitive workload and increased information processing time required by drivers as they approached the intersection of Kreutzer Road while traveling southbound on State Route 47.

e. The unusual height and unexpected location of the temporary traffic signals of a roadway posted at 45 mph placed the signals in a location that prevented them from being seen by some drivers, not only due to the physical limitations of a vehicle's front window (*i.e.*, windshield) height, but also because it placed them in the extreme limit of peripheral vision and outside a driver's useful field of view.

f. Although a static review of the traffic signals suggest that they were visible to any driver with their eyes open, the unexpected location of the temporary traffic signals and the complexity of the required critical information outside of a driver's useful field of view can explain why Mr. Vela may look-but-fail-to-see traffic signal indication information that appear[s] visible and obvious to others.

g. Walgreens video and witness statements indicate that Mr. Vela was not the only driver that failed to stop on the red indication for northbound/southbound State Route 47 traffic at approximately 10:20 AM on March 12, 2014.

h. A second set of traffic signals hung temporarily above a traffic signal mast arm is uncommon and lacks validity making them less likely to be noticed. The temporary

traffic signals placed as they were on March 12, 2014, allowed drivers to essentially rule them out as an informational component that helped carry out the intersection traffic operations tasks at hand.

i. It was foreseeable that placing temporary traffic signals (without backplates) at heights above the MUTCD requirements would contribute to and perhaps induce driver error in observing and processing the traffic signal indication information.[1]

j. Mr. Vela's search sequence that began at the covered traffic signals and then went to ground level traffic control devices, including a search for stop signs, is an expected sequence of visual search.

k. It is more likely than not that the unexpected complexity of the traffic signal system and inconspicuous temporary traffic signals created a series of perception/response time requirements that exceeded the available time on Mr. Vela's approach to the intersection.

l. Mr. Vela made the following statements during his deposition: 'I was driving and I saw the lights covered and I tried to see if there were any stop signs because usually they put stop signs whenever a signal light is not working. And that's why I was rolling, I kept rolling. I never saw any stop signs. And the signal lights that were up there were covered with some kind of tarp. And when I was at about the middle of the intersection, that's when I saw a vehicle approaching. And that's when I saw… some other sets of lights but the wind was, I saw them like, they were not straight down. They were like up. But it was, you know, that's when I hit the car.' (pages 80-81, lines 18-3). 'Well, usually, when—when they are covered like that with something—the way it is right there, usually they have stop signs because the signal lights are not working. So you look for a stop—they usually put stop signs to stop. But I never saw any stop signs or nothing.' (page 84, lines 5-9). 'If the signal lights are covered and there is no stop signs, you have the right-of-way.' (page 153, lines 14-16). It is clear that Mr. Vela entered a complex intersection that violated his experience and expectancy. He then initiated a visual search sequence consistent with his expectations of where to find sources of traffic control information. Each search required a perception/reaction time period. The rapid visual scan process in search of a specific information source (*i.e.*, stop sign) required more time than was available to Mr. Vela on the intersection approach. Not finding the expected stop sign traffic control and the expiration of visual search time led to Mr. Vela's assumption of right-of-way.

m. It is my opinion that the placement and lack of conspicuity of the temporary traffic signals impaired a driver's ability to observe the temporary traffic control indications and were in fact a cause of Mr. Vela's failure to observe the necessary traffic signal indication information prior to the crash."

¶ 42        On September 17, 2019, the trial court conducted a hearing on the motion to strike. It opened by stating that, after reading the briefs, it believed that Noyce cited facts in the record and then "extrapolated" his opinion from those facts. It believed that this constituted speculation, which was not permitted. Brettman responded that, "sure, there is a factual predicate for [Noyce's] opinion."

---

[1] Subparagraph i falls off-pattern from the other subparagraphs, because it contains a legal conclusion. We will address this caveat at the end of the Rule 191 analysis.

¶ 43    The court then expressed concern that Noyce's opinion, if accepted, would conflict with the court's prior findings rendered when granting summary judgment to Burke:

> "THE COURT: [The issue of poor visibility based on unexpected placement has been] dealt with before ***. How do I reconcile that with what I said in ruling on the prior motion for summary judgment?
>
> [BRETTMAN]: Sure. First of all, your prior motion ruling was interlocutory. So that you can amend and change that, if you wish, based on new evidence. We did not have the affidavit of Dr. Noyce.
>
> THE COURT: I'm only laughing at the thought that I could open up a huge can of worms if I were to reach back and do that.
>
> But see, I've made the determination *** based on the facts that were presented to me at the time. *** That there was nothing that told me that they couldn't be seen.
>
> [BRETTMAN]: Correct.
>
> THE COURT: That they were a little bit higher than should have been expected, but there isn't any evidence that that prevented [Vela] from seeing the light. So I think I ruled—one of my findings was that they were visible.
>
> [BRETTMAN]: Sure.
>
> THE COURT: And now you've got an expert *** saying they weren't visible, in essence ***. But how—I can't—these are two positions that I cannot reconcile. So how do I do that?"

Brettman proceeded to explain Noyce's remarks on cognitive processing.

¶ 44    Brettman also argued that Noyce did not base his opinion on speculation. This case, he argued, is unlike the speculation cases cited by defendants, such as *Berke v. Manilow*, 2016 IL App (1st) 150397, where the person who approached the allegedly dangerous scene had no recollection of the ensuing accident. Here, Vela was able to testify in great detail as to what he saw, thought, and did.

¶ 45    The court agreed with Brettman that *Berke* was distinguishable. ("First, I agree with your comment about their cases.") However, it then returned to its opening point that Noyce appeared to be offering opinions, not facts:

> "THE COURT: I accept that these are all plausible *** opinions. But they are still just opinions that he's extrapolating from the facts, and that's where I run into a problem because I don't think that you can use that. *** Tell me if I'm wrong or tell me how I'm wrong.
>
> [BRETTMAN]: I guess I'm—I don't fully understand.
>
> THE COURT: *** Perhaps it would be easier if I allowed [defendants] to explain what they are getting at rather than my interpretation."

¶ 46    Defendants explained that Rule 191 provides that affidavits in opposition to summary judgment cannot consist of conclusions. Case law, particularly *Robidoux*, supports the determination that Rule 191 affidavits in opposition to summary judgment cannot consist of conclusions *unsupported by the evidence*. While an expert testifying at trial *may* offer his or her opinion without disclosing the factual basis, the expert completing a Rule 191 affidavit *may not* offer his or her opinion without disclosing the factual basis. The reason for the difference is that, at trial, the expert is subject to cross-examination, and the opposing party

- 11 -

may discover for itself the factual basis for the opinion. During summary judgment, however, the expert is not subject to cross-examination, and a party should not be able to hire an expert to say "anything" to defeat a motion for summary judgment and obtain a free pass to trial.

¶ 47   Defendants argued that, per the *Robidoux* standard, Noyce's opinion was not supported by facts admissible in evidence: Vela admitted that he saw the red light, other drivers were able to see the red light, and the court had already determined that the lights were visible. Defendants stated: "These lights were visible. This is a fact in the case."

¶ 48   The court agreed and ruled for defendants, stating:

"The problem I had was [Noyce] took facts, and then [he] added conclusions. But those conclusions aren't facts. Those conclusions aren't personal knowledge. And as a result, *** I think that attaching them *** in opposition to a motion for summary judgment is inconsistent with what's intended by Rule 191.

If this were permitted, then, we would never need actual witnesses. We could just get an expert who would create the argument, create the facts for us based on their opinion.

So[,] I don't think [Noyce] offered us facts. I think [he] offered us conclusions based on [his] view of the facts."

The trial court struck subparagraphs e, f, h, i, k, l, and m. It admitted subparagraphs a, b, c, d, g, and j. As to the stricken subparagraphs, the court repeatedly stated that Noyce was offering opinions, rather than facts. The court believed that Noyce was merely speculating when he opined that a driver would be "less likely" to see a light outside the MUTCD height limitation because the light would be in the driver's peripheral vision. The court believed that Noyce was again merely speculating when he opined that a driver would be less likely to see the temporary lights amidst a complicated visual array because the arrangement would violate the driver's expectancies (and increase the driver's cognitive workload). As to the admitted subparagraphs, the court referred to certain subparagraphs, such as d, as facts. It "didn't really have a problem" with other subparagraphs because it did not find them relevant.

¶ 49   On October 3, 2019, the trial court granted summary judgment. For the purposes of summary judgment, it determined that defendants negligently placed the temporary lights at the incorrect height. It determined, however, that the negligent placement of the lights was merely a condition and not a cause of the accident. The negligent placement of the lights did not proximately cause the accident. The court again mirrored the language in *Briske*, determining that Vela's inattention to the obvious was an independent cause of the accident. We quote portions of the court's decision:

"Having previously ruled that the *** height of the traffic lights *** created no more than a condition and not finding that there were any additional facts on which I could reconsider that earlier decision *** the court is going to grant summary judgment.

*** The lights may have been too high, but there's no evidence that their height prevented defendant from seeing them as he approached the intersection. In fact, he admitted to seeing them—one of them moments before impact. *The lights were readily visible; he just didn't see them.* He also didn't see [Gina's] car.

- 12 -

Vela said he saw the permanent lights but *said nothing about the temporary lights being invisible or obscured*. He looked for a stop sign, not the traffic lights, and then ultimately continued into the intersection.

As such, the height of the lights merely created a *** condition, but were not the proximate cause of this accident. The proximate cause of this accident was Vela's failure to observe not only the temporary lights but also [Gina's] vehicle until the moment of impact." (Emphases added.)

The court entered a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). This appeal followed.

¶ 50                                    II. ANALYSIS

¶ 51    Brettman appeals the trial court's decision to strike portions of Noyce's Rule 191 affidavit. He also appeals the trial court's grant of summary judgment to defendants. For the reasons that follow, we agree that the trial court erred in striking the Rule 191 affidavit, except for subparagraph i, and in granting summary judgment to defendants.

¶ 52                                     A. Rule 191
¶ 53                          1. Rule 191: Standard of Review
¶ 54    The case law is split as to which standard to apply when reviewing a trial court's decision to strike a Rule 191 affidavit. See *Bayview Loan Servicing, LLC v. Szpara*, 2015 IL App (2d) 140331, ¶ 18 (*de novo*); *McDonald v. Lipov*, 2014 IL App (2d) 130401, ¶ 34 (abuse of discretion). We favor *de novo* review because the cases that cite *de novo* review have thoughtfully noted the summary judgment context in which the decisions were made. These cases acknowledge that, generally, a trial court's decision to strike an affidavit is reviewed for an abuse of discretion. See *Snow v. Power Construction Co.*, 2017 IL App (1st) 151226, ¶ 79. However, they clarify that the court's decision to strike an affidavit is reviewed *de novo* when the court strikes an affidavit in conjunction with its summary judgment ruling. *Id.*; see also *Berke*, 2016 IL App (1st) 150397, ¶ 21; *Bayview*, 2015 IL App (2d) 140331, ¶ 18; *Jackson v. Graham*, 323 Ill. App. 3d 766, 773 (2001). Brettman also favors *de novo* review, and defendants agree.

¶ 55    A handful of appellate courts have continued to apply the abuse-of-discretion standard. See *McDonald*, 2014 IL App (2d) 130401, ¶ 34; *American Service Insurance Co. v. China Ocean Shipping Co. (Americas)*, 402 Ill. App. 3d 513, 524 (2010). These cases appear to rely on flawed analyses. *McDonald* cites a case that endorses *de novo* review, not abuse-of-discretion review. See *McDonald*, 2014 IL App (2d) 130401, ¶ 34 (citing *Independent Trust Corp. v. Hurwick*, 351 Ill. App. 3d 941, 950 (2004)). Both *McDonald* and *American Service* recite the abuse-of-discretion standard without acknowledging the overriding principle that summary judgment rulings are reviewed *de novo*. See *id.*; *American Service*, 402 Ill. App. 3d at 524. Also, if one traces back the line of authority cited in *American Service*, one reaches cases that have nothing to do with Rule 191. See *American Service*, 402 Ill. App. 3d at 524 (citing *Cincinnati Cos. v. West American Insurance Co.*, 287 Ill. App. 3d 505, 514 (1997)); see also *Lake County Trust Co. v. Two Bar B, Inc.*, 238 Ill. App. 3d 589, 599 (1992) (citing *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 422 (1981) (not a Rule 191 case; applying an abuse-of-discretion standard to the court's ruling on a motion to strike a count in a complaint)); *Deasy*

*v. City of Chicago*, 412 Ill. 151, 154 (1952) (also not a Rule 191 case; applying an abuse-of-discretion standard to the court's dismissal of a complaint for failure to state a cause of action). In turn, moving forward from these older sources, the special circumstance of summary judgment proceedings and the possibility of a different standard of review for striking Rule 191 affidavits is never addressed. See *American Service*, 402 Ill. App. 3d at 524.

¶ 56    While it remains for the supreme court to resolve the split in authority, we again state our preference for *de novo* review. Regardless of whether we review *de novo* or for an abuse of discretion, however, our decision is the same. This is because, as we will explain, the trial court misapplied the strictures of Rule 191. See *Carlson v. Jerousek*, 2016 IL App (2d) 151248, ¶ 69 (the trial court abuses its discretion when it makes an error of law).

¶ 57                                  2. Rule 191: The Merits

¶ 58    Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013) provides in pertinent part:

> "Affidavits in support of and in opposition to a motion for summary judgment under section 2-1005 of the Code of Civil Procedure *** shall be made on the personal knowledge of the affiants; *shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based*; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; *shall not consist of conclusions but of facts admissible in evidence*; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." (Emphases added.)

¶ 59    The parties essentially dispute the application of the phrases, "shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based" and "shall not consist of conclusions but of facts admissible in evidence." Brettman's position is that an affidavit in opposition to summary judgment may contain the expert's opinions and conclusions, so long as the expert provides specific factual support. In portions of their briefs, defendants' position appears to be that an affidavit in opposition to summary judgment may contain the expert's opinions and conclusions, so long as the expert provides specific, *undisputed* factual support. ("Noyce applied generalized academic concepts to *possible* facts, but the *actual* facts established that the temporary traffic signals were visible and unobscured" (emphasis added)). In other portions of their briefs, defendants' position is that an affidavit in opposition to summary judgment may contain the expert's opinion, so long as it is not based on speculation or facts that are refuted by the record. The trial court went a step further, many times indicating that an affidavit in opposition to a motion for summary judgment could not contain opinions and conclusions at all, and that the affidavit must contain only facts.

¶ 60    Brettman's position is correct. *Robidoux*, to which both parties cite, shows that Rule 191's prohibition against conclusions is a prohibition against *bare* conclusions. See *Robidoux*, 201 Ill. 2d at 334-39. In *Robidoux*, the plaintiff's husband died at the hospital from severe injuries sustained in a motorcycle accident. She sued, *inter alios*, the doctor, who, in her view, did not act quickly enough to save him. *Id.* at 327-29. The doctor moved for summary judgment. *Id.* at 329. The plaintiff filed a Rule 191 affidavit, which the trial court struck. *Id.* at 329-31. The appellate court reversed, and the supreme court reversed the appellate court, reinstating the trial court's rulings. *Id.* at 331-32, 347.

¶ 61    The supreme court addressed Rule 191's requirements. As is relevant to the instant case, the supreme court discussed the Rule 191 requirement that affidavits in support of or in opposition to motions for summary judgment "shall consist not of conclusions but of facts

- 14 -

admissible in evidence." (Internal quotation marks omitted.) *Id.* at 333. The court acknowledged that, at trial, an expert may "offer an opinion based on facts not in evidence, and the expert is not required on direct examination to disclose the facts underlying the expert's opinion." *Id.* at 334. However, this trial procedure did not mean that the same standards should be applied to Rule 191 affidavits in support of or in opposition to motions for summary judgment. See *id.* at 335. An affidavit utilized in a summary judgment procedure is subject to a more stringent admission standard than testimony at trial, where an expert can be cross-examined, the expert's underlying facts and data can be probed, and the expert's conclusions can be tested. *Id.* at 335-37. The court noted that, if it were to relax the Rule 191 requirement to correspond with the procedures accepted at trial, then summary judgment could be avoided whenever a party can produce an expert to support its position. *Id.* at 344. The production of an expert's conclusion cannot become a "free pass to trial." (Internal quotation marks omitted.) *Id.*

¶ 62 The *Robidoux* court determined that the affidavit was properly struck because it did not comply with the Rule 191 requirement that it attach sworn and certified copies of all papers upon which the affiant relied. *Id.* at 343-44. As is more closely related to the issue in our case, however, the supreme court was "not convinced" that the affidavit failed to set forth facts with particularity or that it failed to consist not of conclusions but of facts admissible in evidence. *Id.* at 343. While the affidavit did appear to be "somewhat conclusionary," it was not "as devoid of factual support as defendants maintain[ed]." *Id.* For example, the affidavit specified that the defendant failed to timely recognize the " 'unstable pelvic fracture' " as the source of the bleeding, and it opined that there should have been " 'appropriate treatment to immobilize and repair' " the " 'damage to blood vessels in the pelvic region.' " *Id.*

¶ 63 Thus, the supreme court in *Robidoux* never entertained the position that opinions were inadmissible *per se*. Rather, the question was whether the experts should be required to disclose the bases for their opinions and conclusions. Subsequent case law supports the determination that Rule 191 does not bar conclusions *per se*. See *Cain v. Joe Contarino, Inc.*, 2014 IL App (2d) 130482, ¶ 62. Rather, Rule 191 bars only any conclusion for which the affiant provides no specific factual support. *Id.* An affidavit in opposition to summary judgment may contain the expert's opinions and conclusions, so long as the expert provides specific factual support. See *id.*; *Snow*, 2017 IL App (1st) 151226, ¶¶ 83-85; *Miklos v. Caliendo*, 161 Ill. App. 3d 132, 135-36 (1987); *Dangeles v. Marcus*, 57 Ill. App. 3d 662, 668 (1978).

¶ 64 Defendants' position that the expert must provide specific, *undisputed* factual support is incorrect. An expert's testimony is merely the witness's opinion based on facts assumed to be true, and it is for the trier of fact to determine the facts. *Murphy*, 285 Ill. App. 3d at 282. The expert may base his or her opinion on a disputed fact, so long as there is enough evidence to raise a jury question as to that fact. *Id.* The opinion cannot be based on conjecture or speculation. *Id.*

¶ 65 In other portions of their briefs, defendants do raise the legitimate argument that the disputed facts upon which Noyce based his opinion were not supported by enough evidence to raise a jury question as to those facts. The disputed facts were, in their view, not facts at all but mere conjecture and speculation. Again, this is a legitimate argument, but it is unavailing.

¶ 66 Defendants cite several cases—*Berke*, 2016 IL App (1st) 150397; *Rahic v. Satellite Air-Land Motor Service, Inc.*, 2014 IL App (1st) 132899; *Keating v. 68th & Paxton, L.L.C.*, 401

Ill. App. 3d 456 (2010); *Strutz v. Vicere*, 389 Ill. App. 3d 676 (2009)—in support of their argument that Noyce based his opinion not on facts assumed to be true, but on mere conjecture and speculation. Of these, only *Berke* is a Rule 191 case. *Keating*, *Strutz*, and *Rahic* more generally establish that, while proximate cause can be based on circumstantial evidence, it cannot be based on speculation or conjecture. We agree with that proposition, but we focus on *Berke* and Rule 191.

¶ 67    In *Berke*, the plaintiff was a guest in an apartment building who brought a premises liability claim after he slipped and fell inside the vestibule. *Berke*, 2016 IL App (1st) 150397, ¶¶ 1-2. No one saw the plaintiff fall, and the plaintiff had no recollection of the fall. *Id.* ¶ 1. The building owner and manager moved for summary judgment. *Id.* ¶ 3. The plaintiff filed three Rule 191 affidavits. *Id.* ¶ 12. The trial court struck the opinions as speculative, and the appellate court affirmed. *Id.* ¶ 22. In the first affidavit, an accident reconstructionist had presumed that the plaintiff was " 'likely' " looking forward when he fell because people typically looked forward when they walk. *Id.* ¶¶ 23-24. In the second affidavit, an architect presumed, based on the design of the vestibule, that the plaintiff "might" have caught his foot on the threshold of the door as it was closing, even though the doorman testified that he saw the door close after the plaintiff walked through it. *Id.* ¶ 25. In the third affidavit, a medical expert opined that the plaintiff did not fall due to a medical condition. *Id.* ¶ 29.

¶ 68    The first two affidavits in *Berke* highlight the difference between *Berke* and the instant case. The accident reconstructionist and the architect both based their opinions on what a "typical" person was "likely" to do when approaching the physical structure at issue. See *id.* ¶¶ 23-25. However, no one witnessed the plaintiff fall, and the plaintiff had no recollection of the fall. *Id.* ¶ 1. Therefore, the accident reconstructionist could not base his opinion that the plaintiff looked forward on any fact, disputed or agreed. He could not base his opinion on testimony that the plaintiff had, indeed, looked forward. Similarly, the architect could not base his opinion that the plaintiff caught his foot on the threshold on any fact, disputed or agreed. (In fact, the doorman's testimony that he saw the door close after the guest had walked through it (*id.* ¶ 7), meant that the plaintiff could not have caught his foot on the threshold.)

¶ 69    Here, in contrast, Vela recalled his thoughts and actions in approaching the intersection. Noyce's opinion that the incorrect height of the light prevented Vela from seeing it in time to avoid a collision was based on Vela's testimony of his thoughts and actions in approaching the intersection. Vela testified that he saw the covered and inoperative permanent lights, then he looked for a stop sign because that is what is "usually" put in place of an operative light, then he slowed down and continued to "roll" while he looked for a stop sign, and then, in the middle of the intersection, he saw the temporary light. This testimony provides a basis for Noyce's opinion that Vela looked but failed to see the light and that the intersection design violated Vela's expectations. Noyce is not merely opining how a "typical" person would behave when approaching the intersection. Rather, Noyce can point to Vela's testimony that Vela did not, in fact, see the light in time, even though he searched the area for instruction on how to proceed.

¶ 70    Defendants argue that Vela's testimony does not support Noyce's opinion because Vela admitted to seeing the light in statements at the scene and in pleading guilty to disobeying a traffic control device. We reject defendants' argument that Vela's guilty plea to a traffic offense constitutes a judicial admission defeating Noyce's affidavit. A guilty plea to a traffic offense can be a judicial admission. *People v. Powell*, 107 Ill. App. 3d 418, 419 (1982). A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact

within that party's peculiar knowledge. *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 280 (1992). A judicial admission is binding upon the party making the admission and withdraws a fact from contention. *Id.* at 280-81. A party cannot create a question of fact on a motion for summary judgment by contradicting a previous judicial admission. *Id.* at 281.

¶ 71    True, Vela pleaded guilty to disobeying a traffic control device. He told the officer at the scene that he failed to stop at the red light: "[I]t's my fault. I saw my light. It was red but it was too late and I could not stop." He told an officer two days later in a telephone conversation that there were two sets of lights, one covered and one other set. Vela also admitted in deposition that he saw road construction signs in advance of the intersection (and, therefore, defendants imply, was warned to pay attention).

¶ 72    Contrary to defendants' position, Vela's guilty plea to a charge of disobeying a traffic control device did not "remove from contention any factual dispute as to whether Vela saw the signal." Vela's plea and statements do not prohibit Brettman from offering proof, through Noyce's affidavit, that defendants' negligent placement of the lights caused Vela to run the red light and strike Gina. Vela's admissions are not binding on Brettman. See, *e.g.*, *id.* at 280-81. Moreover, Vela did not make a "deliberate, clear, [and] unequivocal statement" about a "concrete fact." *Id.* at 280. Instead, Vela stated that he saw the light but that he saw it too late to act appropriately. True, as defendants note, Vela did not expressly state that he was confused. However, he did not need to expressly label his state of mind as confused. By explaining his perceptions and thought process preceding the accident, he, at least arguably, described a state of confusion. Vela's statements do not contradict Noyce's opinion that defendants' placement of the lights made it difficult, for various scientific reasons, for Vela to see the lights in time to react appropriately. Moreover, that Vela was warned to pay attention does not necessarily help defendants. That Vela was actively looking for direction and could not find it just as easily weighs in favor of Brettman.

¶ 73    We also disagree with defendants that the witness testimony universally contradicts Noyce's conclusion that a driver would have difficulty seeing the temporary lights. Defendants point to testimony from other drivers who had no trouble seeing and obeying the temporary lights. This testimony is not black-and-white, nor is defendants' recitation of it complete.

¶ 74    The witnesses who testified that the light was easily visible—such as Karels, Parkity, and Bennet—were already familiar with the construction zone intersection. On the day in question, they saw what they were expecting to see. This was exactly Noyce's point.

¶ 75    Particularly as to Bennett, it is not clear that her testimony supports defendants' position. On the day in question, Bennett saw the red light 75 feet before the intersection, after she had slowed down due to weather conditions and to enter the right turn lane. Seventy-five feet is not a great distance. (Ironically, it is the typical length of a tractor trailer, such as that driven by Vela.)

¶ 76    Plote omits from its discussion Forty's testimony that, seconds before the accident, she saw a driver in a small car run through the red light, making a mistake similar to Vela's. That driver prompted Forty to think, "that was close," but that driver's mistake did not end in tragedy. The other-driver evidence does not unquestionably contradict Noyce's opinion. Rather, some of the other-driver evidence—such as Forty's testimony and possibly Bennett's testimony—, supports Noyce's opinion.

¶ 77    The trial court agreed that Vela's ability to recall his thoughts and actions in approaching the intersection—and Noyce's ability to point back to that testimony—made this case

distinguishable from *Berke*. However, the trial court struck portions of Noyce's affidavit because it believed that a Rule 191 expert may not offer opinions, but only facts. This position is clearly incorrect. If a Rule 191 expert were not allowed to opine about matters within his or her expertise, then there would be little point in ever procuring a Rule 191 expert, and Rule 191 affidavits would be supplanted by discovery or evidence depositions. This, of course, is inconsistent with the supreme court's analysis in *Robidoux*, which presumed that Rule 191 experts would offer opinions and then went on to require that those opinions be supported by specific facts admissible in evidence or by personal knowledge. *Robidoux*, 201 Ill. 2d at 343-44.

¶ 78    We determine that Noyce's opinions and conclusions are based on facts admissible in evidence, which he cited, or on personal knowledge. Noyce opined that the road curvature impeded visibility, and he attached a picture of the curve. That is not a bare assertion. Noyce pointed to Vela's testimony that Vela *expected* to see a stop light, but he found that it was covered with a tarp; he *next* expected to see a stop sign, but he did not. Noyce opined that Vela's *expectancies* were violated and that Vela went through a *search sequence* that exhausted the time available to make the correct decision. The link between fact and opinion is obvious, as Noyce translated in academic terms what Vela stated in layman's terms. *Cf. Cain*, 2014 IL App (2d) 130482, ¶¶ 63-64 (affidavit properly struck where the expert did not explain why the fact that the contractor observed the plaintiff working without fall protection meant that the contractor had a duty to provide fall protection); *Miklos*, 161 Ill. App. 3d at 136 (affidavit properly struck where the expert cursorily stated that he read the record but did not disclose *which* facts in record documents led to his conclusion that the victim was hit on the shoulder of the roadway).

¶ 79    Noyce also provided the basis for his mathematical calculations. Noyce showed that Vela had no more than 12 seconds to respond from when he saw the construction warning sign until he reached the intersection. He explained that a vehicle traveling 45 miles per hour, or 66 feet per second, would cover the 800-foot distance in 12 seconds. Moreover, Noyce's use of the 45 mile-per-hour speed was supported by Vela's testimony that he was going the posted speed limit of 45 miles per hour before he slowed down closer to the intersection. *Cf. Snow*, 2017 IL App (1st) 151226, ¶ 87 (affidavit struck where the expert failed to disclose how he arrived at the alleged force necessary to move an object). Additionally, Noyce cited on-point scientific authority. For example, he discussed inattentional blindness and he cited research pertaining to it, which he quoted in the text of his report. *Cf. id.* ¶ 88 (affidavit struck where the expert cited an Occupational Safety and Health Administration regulation that was silent as to the expert's corresponding assertion).

¶ 80    In sum, this case does not present a situation where the expert made conclusory assertions so that the party opposing summary judgment could obtain a "free pass" to trial. Here, the trial court applied the wrong standard in striking portions of the Rule 191 affidavit. It believed that it was improper for Noyce to submit opinions. Instead, it is improper to submit opinions without factual support. The trial court, and defendants, also incorrectly stated that the facts did not support Noyce's opinion because the lights were plainly visible to drivers and Vela admitted to seeing it. Instead, Noyce was permitted to base his opinions on a disputed fact, that the lights were not plainly visible to drivers, because there was enough evidence to raise a jury question as to that fact. We will discuss that evidence in the next section.

¶ 81 We now address subparagraph i, which falls off-pattern to the other subparagraphs, because it contains not just a conclusion based on facts, but a *legal* conclusion. Subparagraph i states: "It was *foreseeable* that placing the temporary traffic signals (without backplates) at heights above the MUTCD requirements would contribute to and perhaps induce driver error in observing and processing the traffic signal indication information." (Emphasis added.) The court struck this paragraph, explaining that "[Noyce] incorporated foreseeability into it, I thought that was an attempt to work a legal conclusion in. So I'm striking that."

¶ 82 In *Cain*, this court wrote that an expert may offer *legal conclusions* in a Rule 191 affidavit, provided the affidavit meets the other Rule 191 requirements. *Cain*, 2014 IL App (2d) 130482, ¶ 62. We relied upon Illinois Rule of Evidence 704 (eff. Jan. 1, 2011), which pertains to *ultimate issues*: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." We also cited *Taylor v. City of Beardstown*, 142 Ill. App. 3d 584, 598 (1986), which allowed an opinion that the defendant's employees met the standard of care applicable to nursing staffs in like hospitals under like circumstances.

¶ 83 Permission to opine on an ultimate issue, however, is not synonymous with permission to express that opinion as a legal conclusion. The difference is subtle, and the Illinois case law addressing it is sparse. The two Illinois civil cases that discuss Rule 704 are *Cain* and *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶¶ 77-79, 95-96. (There is also *Wardwell v. Union Pacific R.R. Co.*, 2016 IL App (5th) 140461, *rev'd*, 2017 IL 120438.) In *McHale*, the court distinguished between an ultimate issue and a legal conclusion. *McHale*, 2015 IL App (1st) 132625, ¶¶ 96, 98. The witnesses could address the ultimate issue—agency—by stating that an *employer-employee* relationship existed under trucking regulations. See *id.* ¶ 76. However, they could not opine that one was an employee of the other under common law or that one was the *agent* of the other *in a legal sense*—doing so would be stating a legal conclusion. *Id.* ¶¶ 76-79. In fact, the *Taylor* example regarding the standard of care was not a legal conclusion. It was an opinion on the ultimate issue, negligence, expressed in terminology appropriate to the witness's expertise. If the expert had stated that the defendant's employees were negligent, that would have been a legal conclusion. Therefore, while we stand by our opinion in *Cain*, we herein clarify a portion of its black-letter-law section.

¶ 84 We look to Rule 704's federal counterpart to explain. The advisory committee notes on Rule 704's federal counterpart state:

"The abolition of the ultimate issue rule does not lower the bar[ ] so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. *** *[These provisions] *** stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.* Thus[,] the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." (Emphasis added.) Fed. R. Evid. 704, Advisory Committee Note.

See also Michael H. Graham, Handbook of Federal Evidence § 704.1 (8th ed. 2019). As such, when addressing the ultimate issue, the expert, or any witness, should avoid couching his or her opinion as a legal conclusion. See *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). The problem with testimony containing a legal conclusion is that it can convey the

- 19 -

witness's unexpressed, and perhaps erroneous, legal standards to the jury. *Id.* An expert is uniquely qualified by his or her experience to assist the trier of fact, but an expert cannot compete with the judge in its responsibility to instruct the jury. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

¶ 85 The line between permissible ultimate issue testimony and impermissible legal conclusions is not always easy to see. *Torres*, 758 F.2d at 150. Courts should decline to admit testimony that is phrased in terms that have a special meaning in the law that is different from their meaning in the common vernacular. *Id.* at 151. Examples from the case law include excluding testimony that the defendant was "negligent" but not that the defendant's conduct fell below the standard of care (*Haney v. Mizell Memorial Hospital*, 744 F.2d 1467, 1473-75 (11th Cir. 1984)), and excluding testimony that the defendant used "unjustified" "deadly force" (*Hygh*, 961 F.2d at 363-64). Again, opinions couched in legal terms could cause the jury to misunderstand the law. *Torres*, 758 F.2d at 150.

¶ 86 Here, Noyce averred in subparagraph i that it was "foreseeable" that placing the temporary traffic lights at heights above the MUTCD limitation would induce driver error. The term "foreseeable" has a special meaning in the law that is different from its meaning in the common vernacular. Therefore, Noyce could not phrase his conclusion using this term. The trial court was correct to strike subparagraph i. A Rule 191 affidavit is a substitute for testimony taken in open court and should meet the same requisites as competent testimony. *US Bank, National Ass'n v. Avdic*, 2014 IL App (1st) 121759, ¶ 22. Also, the court may not consider evidence that would be inadmissible at trial when assessing a motion for summary judgment. *Id.* Even without subparagraph i, however, Brettman's case against defendants survives summary judgment and our analysis otherwise remains the same.

¶ 87 B. Summary Judgment

¶ 88 Summary judgment is a drastic means of disposing of litigation. *Axen v. Ockerlund Construction Co.*, 281 Ill. App. 3d 224, 229 (1996). As such, a court may grant summary judgment only where, in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* The purpose of summary judgment proceedings is to determine whether a question of fact exists, not to try it. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 517 (1993). Even if the facts are undisputed, if reasonable persons could draw different inferences from the facts, a triable issue exists and summary judgment should be denied. *In re Estate of Jessman*, 197 Ill. App. 3d 414, 419 (1990). We review *de novo* the trial court's grant of summary judgment. *Bigelow Group, Inc. v. Rickert*, 377 Ill. App. 3d 165, 168 (2007).

¶ 89 To prevail on a negligence claim, a plaintiff must prove that (1) the defendant owed a duty of reasonable care to the plaintiff, (2) the defendant breached that duty, and (3) the breach was the proximate cause of the plaintiff's injuries. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). Here, the trial court determined that questions of fact remained as to the first two elements but that, as a matter of law, any negligent placement of the light did not proximately cause the accident. In the court's view, the negligent placement of the light was a condition and not a cause of the accident.

¶ 90                                    1. Proximate Cause

¶ 91        There are two components to proximate cause: cause-in-fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). When considering cause-in-fact, courts generally employ either the traditional "but for" test or the "substantial factor" test. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. Under the "but for" test, "a defendant's conduct is not the cause of an event if the event would have occurred without it." (Internal quotation marks omitted.) *Id.* Under the "substantial factor" test, a defendant's negligence is a cause-in-fact if it was a material and substantial factor in bringing about the injury. *Id.* Where reasonable minds could differ, whether a defendant's conduct was a material and substantial factor in bringing about the injury is a question for the jury. *Lee*, 152 Ill. 2d at 455.

¶ 92        Legal cause involves an assessment of foreseeability. *Id.* at 456. An injury is foreseeable if a reasonable person would see it as a likely result of his or her conduct. *Id.* An injury is not foreseeable if it is so highly extraordinary that imposing liability is not justified. *Id.* Thus, foreseeability presents a policy question: "How far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" (Internal quotation marks omitted.) *Turcios*, 2015 IL 117962, ¶ 24 (citing *Prodromos v. Everen Securities, Inc.*, 389 Ill. App. 3d 157, 171 (2009) ("Because the consequences of every action stretch forward endlessly through time and the causes of every action stretch back to the dawn of human history, the concept of proximate cause was developed to limit the liability of a wrongdoer to only those injuries reasonably related to the wrongdoer's actions.")).

¶ 93        Illinois courts draw a distinction between a condition and a cause. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999). Condition-versus-cause cases may be thought of as a subset of proximate cause case law. *Id.* at 259. The condition-versus-cause dichotomy is consistent with the two-prong definition of proximate cause, cause-in-fact and legal cause, set forth above. See *id.* at 257-59. Under both analyses, the question is whether the defendant's negligence was a material and substantial factor in bringing about the injury, and, if so, was the injury of a type that a reasonable person would see as a likely result of his or her conduct. *Id.* at 258-59.

¶ 94        If the defendant's negligence does nothing more than furnish a condition by which the injury is made possible, and such condition, by the subsequent independent act of a third person, causes an injury, then the two acts are not concurrent and the creation of the condition is not the proximate cause of the injury. *Id.* at 257 (citing *Briske*, 379 Ill. at 199). An intervening efficient cause is a new and independent force that breaks the causal connection between the original wrong and the injury and itself becomes the cause of the injury. *Id.* The test is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence. *Id.*

¶ 95        *First Springfield* illustrates the cause-versus-condition dichotomy. In *First Springfield*, the defendant negligently parked a tanker truck midblock in a no-parking zone on a four-lane street. There was an unobscured, designated cross-walk at the end of the block. A pedestrian attempted to cross the street midblock, right in front of the parked truck, rather than at the cross-walk. She was hit by oncoming traffic. The court determined that the defendant's negligent parking was merely a condition that made the injury possible. *Id.* at 260. True, if the defendant had not parked in the no-parking zone, the pedestrian would have had an unobstructed view of traffic. *Id.* However, it was the pedestrian's independent decision to jaywalk that broke the causal connection between the parking violation and the (pedestrian's

- 21 -

own) injury. *Id.* at 261. The defendant's parking violation did not cause the pedestrian to jaywalk, and the defendant could not have reasonably anticipated the pedestrian's decision to jaywalk as a natural consequence of his conduct. *Id.* The court distinguished the facts before it from those in *Scerba v. City of Chicago*, 284 Ill. App. 3d 435, 439-41 (1996), where the defendant parked his car *on* the designated crosswalk. In *Scerba*, the defendant's negligent parking did, at least arguably, cause the pedestrian to jaywalk, and the defendant should have anticipated that a pedestrian might jaywalk if the crosswalk is not available. *Id.* In *Scerba*, the pedestrian's decision to jaywalk followed from the defendant's negligence, whereas, in *First Springfield*, it constituted an independent act. *First Springfield*, 188 Ill. 2d at 261.

¶ 96    *Parsons v. Carbondale Township*, 217 Ill. App. 3d 637 (1991), is also instructive. In *Parsons*, the township breached its duty of care by installing a warning sign in violation of the MUTCD. *Id.* at 645. The sign warned of a dangerous hill ahead, but it was installed at the wrong height, was not the right shape, and did not use the proper reflective material. The driver did not see the sign. The court determined that there was at least a question of fact as to whether the driver's failure to reduce his speed on the hill was not an independent cause, breaking the causal connection between the city's negligent installation of the sign and the driver's accident. *Id.* at 648. As there can be more than one proximate cause of an injury, the driver's negligence, if any, was concurrent with the township's negligence. *Id.* The township should anticipate some deviation from normal traffic patterns. *Id.* at 647. The inability of a driver to brake in time to avoid an accident after failing to see a nonconforming warning sign was a foreseeable consequence of constructing and installing a warning sign that did not meet the MUTCD requirements. *Id.* Moreover, the court stated that it was not speculative, but was a question of fact for the jury, as to whether the driver would have acted any differently if he had seen the warning sign. *Id.* at 648.

¶ 97    We conclude that, as in *Parsons*, there is at least a question of fact as to whether defendants should have anticipated that, if they violated the MUTCD and hung the temporary traffic lights too high, drivers would have difficulty seeing the lights, and an accident could result. The height of the lights violated the MUTCD requirements. Przbyla testified that the purpose of the MUTCD height requirement was to provide drivers with the visual information that they need *at the time they need it*. Guge and Emery both testified that the purpose of the MUTCD height requirement was to aid visibility. Noyce opined that the lights were placed in the extreme periphery of a driver's field of view.

¶ 98    Further, there is at least a question of fact that Vela's alleged inattention was not an independent force breaking the causal chain between defendants' negligent placement of the lights and the accident. At least one other driver made the same mistake as Vela, just seconds before the accident. Vela himself testified that he was actively looking for direction, making it less likely that he was simply inattentive and more likely that he was confused by the setup of the traffic control devices.

¶ 99    We do not accept, as a matter of law, that the lights were plainly visible to drivers. Of course, when one looks at the picture of the intersection, one can clearly see the temporary lights. However, a picture does not provide the perspective of a driver moving in a vehicle with a certain field of view. The static picture does not show that the temporary lights, which were already in the periphery field of view, were, according to Vela, blowing in the wind and smaller than the permanent fixtures that first grabbed his attention. Defendants make much of the fact that one of the lights was merely one foot beyond regulation and contend that this should not

- 22 -

have impacted Vela's ability to see it. We disagree. A jury could very well determine that the regulations were there for a reason and that any deviation from them impeded visibility. Also, the light above Vela's lane was 29 feet, 3.4 feet above regulation and a 40% deviation from the 8.6-foot permissible placement range of 17 to 25.6 feet. Noyce's remarks concerning heat maps showed that an upward deviation, as was present here, can impede visibility more than a downward deviation because drivers tend to search at ground level when they do not see the instruction they expect. At oral argument, Plote was asked if the lights would be visible to drivers at any height. It answered, no, not at *any* height. Plote's response reveals that it is asking the court to make a factual determination that 3.4 feet too high should not impede visibility but that 20 feet too high, for example, might. This sort of determination is not appropriate at the summary judgment stage. A jury should have the opportunity to consider the evidence, including Vela's live testimony, and decide for itself whether the lights were plainly visible to drivers.

¶ 100    The instant case is distinguishable from *Briske*, the case upon which the trial court relied for the proposition that, when a view of the danger is unobstructed, a driver's failure to heed it is necessarily the independent cause of the accident, and the danger is merely a condition that made the injury possible. In *Briske*, the defendant Village placed a barricade across a closed street in front of train tracks. The street was closed because it was undergoing improvements. The barricade consisted of a solid rail, about three or four feet in height, and it extended entirely across the closed street. It was painted in alternate black and white stripes and held in place by four or five upright posts driven into the pavement. It held a red reflector at its center, which was between 6 and 12 inches in both height and width. The plaintiff was a passenger in a car that crashed into the barricade at 9:30 p.m., on a clear night on a clear, paved road. The street was illuminated at the corner. The street was not illuminated near the barricade, though the car's headlights were working. *Briske*, 379 Ill. at 195-96.

¶ 101    The plaintiff testified that she and the driver were looking to see if a train was coming when they hit the barricade. They, as well as another passenger, did not see the barricade until the moment of impact. The driver testified, similarly, that the reflector could not be seen until " 'you got on top of it.' " The driver, as well as the other passenger, testified that the car was traveling between 15 and 20 miles per hour at the time of impact. *Id.* at 196-97.

¶ 102    The only eyewitness testified that he had seen the car traveling between 35 and 40 miles per hour at the time of impact. The driver, the plaintiff, and the other passenger admitted to having one or two beers before the crash, and the witness, who spoke with the driver after the crash, smelled the odor of alcohol on the driver's breath. *Id.* at 198.

¶ 103    A jury returned a verdict for the plaintiff. However, the appellate court reversed, determining that any alleged negligence by the defendants in placing the barricade was a condition and not a cause of the accident. *Id.* at 199. The driver's negligence was a new and independent force that caused the injury. *Id.* The court explained:

    "[Any negligent placement of the barricade] did [nothing] more than furnish a condition ***. In short, the intervening efficient cause of plaintiff's injuries was [the driver's] negligence. *** According to [the driver's] own testimony, his lights were functioning properly and *it follows, necessarily, that it was his inattention which constituted the negligence occasioning injuries to [the plaintiff]*. The conclusion is inescapable, under these circumstances, that [the driver] could and would have stopped his car had he used his powers of observation. The law does not permit him to say that

- 23 -

he did not see the obstruction when, if he had properly exercised his faculty of sight, he would have seen the barrier. [Citations.] As this court [has observed]: 'The law will not tolerate the absurdity of permitting one to testify that he looked and *did not see the danger when the view was unobstructed* and where, if he had properly exercised his sight, he would have seen it. [Citations.]' " (Emphases added.) *Id.* at 199-200.

¶ 104     In this case, unlike in *Briske*, Vela's alleged negligent inattention did not solely cause him to miss the temporary light. To the contrary, the evidence, when viewed in the light most favorable to Brettman, shows that Vela actively searched for an instructive signal. He was not inattentive. Similarly, the evidence supports the conclusion that, under certain conditions, people *do* "look[ ] and *** not see the danger [even] when the view [is] unobstructed" (internal quotation marks omitted) (*id.* at 200) and that those conditions were present here. It does not "follow[ ], necessarily" (*id.*), that a person who looks but fails to see is inattentive. Noyce testified in detail to this point. Even without Noyce's affidavit, or portions of it, Przbyla testified that the MUTCD height limitation for traffic lights provide motorists with the visual information within their field of view so that they have the information they need at the time they need it. And, again, two engineers, Guge and Emery, testified that the purpose of the height limitation is to ensure that people see the traffic light. If the light is too high, it will be in the driver's periphery. The evidence shows that the issue is not just whether an object is obstructed, it is also where the object is placed.

¶ 105     Finally, we reject defendants' argument that Vela's actions constituted an independent cause because Illinois law requires drivers to treat inoperative lights as stop signs. Defendants cite *Quirke v. City of Harvey*, 266 Ill. App. 3d 664, 669-70 (1994), where the court noted that, in the event a traffic signal becomes inoperative, drivers are to treat the inoperative light as a stop sign. As such, in *Quirke*, the city could not have foreseen that, when it turned off its stoplights to address a safety issue, a car would proceed through the intersection without stopping. *Id.* at 670.

¶ 106     The instant case is distinguishable from *Quirke* because it does not involve an *inoperable* light. It involves an *operable* light that, for the purposes of summary judgment, was difficult to see. Vela initially *perceived* the light to be inoperable. If a driver acts on the incorrect perception that the light is inoperable and treats it as a stop sign, he has a significant chance of stopping on a *green* light and causing confusion and danger for the car behind him. *Quirke* does not implicate the circumstances in this case, where the improper height, at least arguably, created a confusing situation that defendants should have anticipated could lead to an accident.

¶ 107                                        2. Duty

¶ 108     Defendants urge us to consider an alternate ground for affirming the trial court's grant of summary judgment. They argue that they had no duty to hang the temporary light in accordance with the 25.6-foot height limitation.

¶ 109     According to Virgil Cook, the trial court did not expressly rule as to duty. Instead, it found that the absence of proximate cause controlled the case. We disagree with Virgil Cook's summation. The parties asked for clarification on the issue of duty, and the trial court provided:

          "A VOICE: I—A couple of questions: The—the motions we filed also had a section on whether or not the—the signals were at the appropriate height.

- 24 -

I am just wondering for the record whether the court made any finding as to that or just didn't consider that and moved onto proximate cause?

THE COURT: I—I as to whether or not they were at the appropriate height?

A VOICE: Right.

THE COURT: *Well I felt that was ultimately a question of fact*.

A VOICE: Okay.

THE COURT: So I construed that in favor of the plaintiff." (Emphasis added.)

Regardless, we review the court's judgment, not its rationale, and we may affirm on any basis that the record supports. *D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865, ¶ 30. Therefore, we address defendants' duty argument.

¶ 110　　The parties agree that the scope of defendants' duties was defined by their respective contracts. The duty owed by a contractor in a negligence action is defined by the scope of the contract. *Ferentchak v. Frankfort*, 105 Ill. 2d 474, 482 (1985). Defendants acknowledge that the contract required them to follow the MUTCD requirements, but they dispute that the MUTCD placed a height limitation on temporary lights. Defendants also assert that section 18.09 of the MUTCD and certain provisions of the contracts allow for deviation from the provisions and plans when warranted by "engineering judgment."

¶ 111　　We recognize that the record contains evidence supporting defendants' position. Section 4D.15 of the MUTCD does not specify that the height limitation applies to temporary lights. Emery testified that the MUTCD height limitation does not apply to temporary lights. Even if it did, some deviation based on engineering judgment may be permitted. Also, certain plan drawings show only the minimum, 17-foot height.

¶ 112　　However, other evidence shows, at least arguably, that the maximum height limitation applied. The contract adopted the MUTCD. The MUTCD height limitation could be interpreted to apply to temporary lights. Although section 4D.15, with its height requirements, did not specify that it applied to temporary lights, section 4D.32 stated that temporary lights were to meet the same physical display requirements as conventional signals. Guge testified that the MUTCD's 25.6-foot height limitation applies to wire-mounted as well as permanent signals. Janikowski testified to a document entitled "[IDOT] District 1 Notes for *Temporary Signals*." (Emphasis added.) Appendix B, Note 5, of that document requires that the top of a signal be no more than 25.6 feet above the pavement, the same height as set forth in the MUTCD.

¶ 113　　Moreover, even if engineering judgment would have allowed for the lights to be placed higher than 25.6 feet above the pavement, there is no evidence that the placement here was a result of judgment rather than inattention. Defendants do not point to the testimony of any engineer that he or she purposefully placed the lights as high as 32 feet above the pavement and believed the deviation was warranted based on factors x, y, and z. Similarly, it is not clear that the evidence would support such a deviation as a *sound* exercise of engineering judgment, since the Walgreens video and witness testimony show that other drivers had difficulty seeing the temporary light. Defendants' point that several documents in the project plans specified only a minimum height, 17 feet, but not a maximum height, does not necessarily support its position. It could be argued that the project plans specified a *minimum* height, because it was *higher* than that set forth in the MUTCD, thus narrowing the range of permissible placement.

In the absence of further direction, the *maximum* height would be the default MUTCD height of 25.6 feet.

¶ 114     We are not bound, as defendants suggest, by the trial court's determination that, in the Burke litigation, Burke did not owe a duty to ensure that the temporary lights were hung at a certain height. The scope of Burke's duty was defined by its contract with the Village of Huntley. The court determined that the contract did not include a duty to ensure that the temporary lights were completed according to project specifications. There was no question as to what those specifications entailed. Here, in contrast, defendants accept that the scope of their contract with IDOT required them to install the temporary lights according to project specifications. There is a question as to what those project specifications entailed, and, as such, summary judgment was not appropriate. We will not delve further into the trial court's comments at the Burke summary judgment hearing, as that issue is not before us.

¶ 115     For these reasons, we believe that a triable question of fact remains as to duty.

¶ 116                                III. CONCLUSION

¶ 117     For the reasons stated, we reverse the trial court's grant of summary judgment and remand for further proceedings.

¶ 118     Reversed and remanded.